504 A.2d 637

# MARYLAND INSURANCE GUARANTY ASSOCIATION

v.

### Edward J. MUHL, Receiver.

### No. 671, Sept. Term, 1985.

Court of Special Appeals of Maryland.

Feb. 10, 1986.

John E. Griffith, Jr. (Lewis A. Noonberg, H. Mark Stichel and Piper & Marbury, on brief), Baltimore, for appellant.

Steven M. Caplan (William W. Cahill, Jr. and Weinberg and Green, on brief), Baltimore, for appellee.

Argued before WILNER, ROSALYN B. BELL and WENNER, JJ.

WILNER, Judge.

This dispute is between the Maryland Insurance Guaranty Association (MIGA) and the State Insurance Commissioner, acting as receiver for the insolvent Maryland Indemnity Insurance Company (Md. Indemnity). It involves the status of certain claims made by MIGA and others in the insolvency proceeding.

Md. Indemnity was declared insolvent and placed in receivership by the Circuit Court for Baltimore City effective December 16, 1977. Pursuant to Md.Code Ann. art. 48A, § 145, the Commissioner was appointed as receiver and directed by the court to liquidate the business of the compa-

ny in accordance with applicable provisions of the State Insurance Code.

MIGA is an unincorporated association created by the General Assembly in 1971 "to provide a mechanism for the prompt payment of covered claims under certain insurance policies and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer...." Art. 48A, § 504(a). It stands in the shoes of the insolvent insurer and, subject to applicable policy limits and conditions, is liable for "covered claims" that could have been brought against that insurer. § 508(a). To the extent that it incurs loss and expense, it may seek reimbursement from the assets of the insolvent insurer by making a claim in the receivership proceeding. § 511. See a related discussion in *Maryland Life & Health Ins. v. Perrott*, 301 Md. 78, 482 A.2d 9 (1984).

In accordance with its governing statute (art. 48A, §§ 504–519) and its plan of operation, MIGA undertook the adjustment, defense, and payment of claims made against Md. Indemnity, eventually paying claims and incurring expenses of some $2.7 million. MIGA, in turn, filed a claim in the Md. Indemnity liquidation proceeding, seeking a priority status pursuant to art. 48A, § 158A. Section 158A does indeed purport to give the claims of MIGA and certain other claimants a priority over all other claims except those for expense of administration, wages, and taxes. The receiver rejected MIGA's asserted priority status, however, on the basis that § 158A, which was enacted in 1978 and thus took effect after the order for liquidation, did not apply. That is the first area of dispute.

Art. 48A, § 161(b) provides, in relevant part, that after entry of an order for liquidation, the Commissioner must notify all persons having claims against the insolvent insurer to file such claims with the Commissioner "at a place and within the time specified in the notice, or that such claims shall be forever barred." The time specified in the notice "shall be as fixed by the court for filing of claims...."

Section 149(2) of art. 48A requires that all claims filed in Maryland shall be filed with the receiver "on or before the last date for filing as specified in this subtitle." Pursuant to court order, the Commissioner gave public notice to all potential claimants to file their claims with his special deputy by June 30, 1978—the date specified in the court order. That date, then, by reason of § 149(2), became "the last date" for filing claims.

During the liquidation process, a number of claims were filed by or on behalf of persons allegedly injured through the negligence of individuals insured by Md. Indemnity. Those claims, based on Md. Indemnity's contractual liability for the negligent acts of its insureds, were referred to MIGA by reason of MIGA's vicarious statutory liability. To the extent that those claimants had available to them uninsured motorist benefits under their own insurance policies, however, MIGA rejected the claims as premature; it took the position that the claimants had to exhaust their uninsured motorist coverage before making claims against MIGA. *See* art. 48A, § 512(a), which seems rather clearly to support that view.

Notwithstanding § 512(a), the Commissioner disagreed with MIGA's position on that and a number of other issues. On May 9, 1978, he filed in the liquidation proceeding a petition for declaratory decree seeking, among other things, a declaration that MIGA was obligated to pay those claims without regard to any uninsured motorist coverage in the claimants' own policies. On November 1, 1979, the court resolved that controversy by determining that claimants with uninsured motorist coverage must first exhaust that coverage and were entitled to seek recompense from MIGA only for the unreimbursed part of the claim. No appeal was apparently taken from that decree, and so, acting in accordance with it, the various insurers began paying uninsured motorist benefits to their insureds. They thereafter attempted to file claims in the liquidation proceeding for recompense.

These claims, by the insurers, were filed long after the June 30, 1978, deadline stated in the Commissioner's notice, and MIGA took the position that they were therefore barred. The Commissioner disagreed. He did not regard those claims as even being in existence prior to the November, 1979 decree, and thus viewed the barring of the claims as inequitable. That is the second area of dispute.

To resolve these issues, the Commissioner filed, in the liquidation proceeding, another petition for declaratory decree. In Count One, he asked for a declaration that § 158A of art. 48A "does not apply to a liquidation proceeding commenced before [its] effective date" and that MIGA "is therefore not entitled to a priority in the distribution of the Receivership's assets over the general creditors." In Count Two, he asked the court to construe §§ 149(2) and 161(b) of art. 48A and clarify the rights of the parties "as regard claims filed or presented after [June 30, 1978] but which claims were not cognizable or ascertainable and thus not properly presentable prior to [that date]."

The court gave each side part of the loaf. On Count One, it ruled in favor of the Commissioner, declaring that § 158A could not be applied in the pending proceeding because it affected substantive and vested rights. That made MIGA a general creditor. On Count Two, it sided with MIGA, concluding that claims filed after June 30, 1978, were barred. As a result of those rulings, we have cross-appeals.

## I. *Application Of § 158A*

Art. 48A, § 156 provides:

"The rights and liabilities of the insurer and of its creditors, policyholders, stockholders, members, subscribers and all other persons interested in its estate shall, *unless otherwise directed by the court,* be fixed as of the date on which the order directing the liquidation of the insurer is filed in the office of the clerk of the court which made the order, subject to the provisions of this subtitle with respect to the rights of claimants holding contingent claims." (Emphasis added.)

■ As of the date of the liquidation order—December 16, 1977—a claim by MIGA for reimbursement would not have been entitled to any priority over the claims of other general creditors holding non-contingent claims. The only priorities at that time were for special deposit claims (§ 150(3)), secured claims (§ 150(4)), certain wages owed to the officers and employees of the insolvent insurer (§ 158), taxes, and expenses of administration. By 1978 Md. Laws, ch. 798, however, effective July 1, 1978, the General Assembly enacted § 158A, which gives a priority status to three other types of claims: (1) subject to applicable policy limits, those of policyholders, beneficiaries, and insureds arising from and within the coverage of policies issued by the insolvent insurer, (2) liability claims against insureds that are within the coverage and policy limits of policies issued by the insolvent insurer, and (3) claims of MIGA, its counterpart for health and life insurance (Maryland Life and Health Insurance Guaranty Association), and any similar organization in another State. If § 158A is applicable, we are told, MIGA will get virtually all of the unsecured assets of Md. Indemnity and the other creditors will receive little or nothing.

In *Janda v. General Motors*, 237 Md. 161, 205 A.2d 228 (1964), the Court of Appeals set forth four principles for determining whether a statute is to be applied "retrospectively or prospectively":

(1) ordinarily, "a change affecting procedure only, and not substantive rights ... applies to all actions ... whether accrued, pending or future, unless a contrary intention is expressed";

(2) ordinarily, "a statute affecting matters or rights of substance will not be given a retrospective operation as to transactions, matters and events not in litigation at the time the statute takes effect" unless the Legislature expressly directs otherwise or unless its "manifest intention ... could not otherwise be gratified";

(3) even if the Legislature so intended, a statute "will not be applied retrospectively to divest or adversely affect vested rights ...";  and

(4) a statute which "affects or controls a matter still in litigation when it became law will be applied by the court reviewing the case at the time the statute takes effect although it was not yet law when the decision appealed from was rendered, even if matters or claims of substance (not constitutionally protected), as distinguished from matters procedural or those affecting the remedy are involved, unless the Legislature intended the contrary." *Id.*, 168–69, 205 A.2d 228.

Having stated these principles, the *Janda* Court immediately recognized that

> "[t]he various categories of matters procedural or those concerning the remedy, and matters of substance, vested or accrued, or not vested or accrued, as well as rights protected by the due process clause, tend to overlap in many instances and are not always easy to accurately recognize or to delineate or define in a given instance."

*Id.*, 170, 205 A.2d 228. In *T & R Joint Ven. v. Office, Plan. & Zon.*, 47 Md.App. 395, 424 A.2d 384 (1980), we had occasion to review *Janda* and its progeny. We observed that some of the decisions were not easy to reconcile, and concluded that:

> "*Janda* really involves an admixture of both retro- and pro-spectivity; and when seen in that light, some of the facially illogical results flowing from it become a bit easier to understand and accept. It involves retroactive application in the sense that the issue before the court is ultimately resolved on the basis of principles that were not in being, or were not controlling, at the time the action was commenced (or at the time the underlying transaction occurred). But to the extent that it merely requires the court to apply the law currently in effect to a matter still before it, and thus not yet settled, the applica-

tion is more in the nature of a prospective and current one.

Much of this, of course, is semantics. All of the discussion about retroactivity, of form or procedure versus substance, ultimately comes down to two things: (1) did the body that enacted the new law (whether legislative, executive/administrative, or judicial) give any clear indication as to whether or how it should be applied to pending matters, and (2) would it be basically unfair to so apply it?"

*Id.*, 406–07, 424 A.2d 384.

We found compelling the analysis of the Supreme Court in *Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 717, 94 S.Ct. 2006, 2016, 2019, 40 L.Ed.2d 476 (1974), that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary" and that the issue of "manifest injustice" centered on three factors—"(1) the nature and identity of the parties, (2) the nature of their rights, and (3) the nature of the impact of the change in law upon those rights." *T & R Joint Ven.*, 47 Md.App. at 407, 424 A.2d 384. This is not really a different test; it continues to focus first on any discernible legislative intent and second on the effect of applying the statute to existing proceedings or transactions. The second consideration is simply expressed in more general terms and does not turn solely upon the sometimes hairsplitting determinations of what "rights" are "substantive" as opposed to "procedural" or "remedial" and what rights, whether or not "substantive," are "vested."

Although in at least two later cases (*Spielman v. State*, 298 Md. 602, 471 A.2d 730 (1984), and *Vytar Associates v. City of Annapolis*, 301 Md. 558, 483 A.2d 1263 (1984)), the Court of Appeals has mentioned the "substantive" and "vested" rights criteria, it has not rejected the approach taken by the Supreme Court in *Bradley* or by us in *T & R Joint Ven.*, and we therefore continue to adhere to it. *See*

*Courtney v. Richmond,* 55 Md.App. 382, 390–91, 462 A.2d 1223 (1983).

The first criterion in any analysis is legislative intent: did the Legislature intend the statute to be applied in a pending proceeding—in this case, a proceeding in which the order of liquidation was entered and the "rights and liabilities" of all persons interested in the insolvent estate became "fixed" prior to the effective date of the law?  We find no clear expression of legislative intent one way or the other with respect to § 158A.  It carried the normal effective date of July 1, and there is no language in either the statute itself or in the sparse legislative history indicative of any particular intent in this regard.  Although the bill was enacted in the next regular legislative session following the declaration of Md. Indemnity's insolvency, that may have been a mere coincidence.  The language of the statute seems to have been drafted by or for the National Committee on Insurance Guaranty Funds and proposed by that Committee in 1977 to the National Association of Insurance Commissioners.  *See* 1977 NAIC Proceedings, Vol. II, p. 366.  Similar legislation was enacted in other States between 1977 and 1980.  *See* Mass.Code, ch. 175, § 180F; N.J.Code, § 17:30C–26; R.I.Code § 27–14–22.  There thus being no clear articulation of legislative intent, we turn to examine the effect of applying the statute to the instant proceeding.

As a prelude, we note the case of *Mass. Motor Vehicle, Etc. v. Com'r of Ins.,* 379 Mass. 527, 400 N.E.2d 221 (1980).  The issue there was whether the receiver of an insolvent insurer or the Massachusetts counterpart to MIGA was entitled to proceeds owed to the insurer by a reinsurer.  The insurer had been declared insolvent in 1974.  The Court pointed out in n. 9 at 224 that the case was *not* governed by the Uniform Insurers Liquidation Act (the Maryland counterpart of which is found in art. 48A, §§ 132, 145–148, 150, and 151).  It then mentioned the Massachusetts version of § 158A (c. 175, § 180F, *see ante*), also enacted in 1978, allowing the Mass. Insurers Insolvency Fund "a preferred creditor status in insurer insolvencies," and stated flatly,

"If the [reinsurance] proceeds were an asset of [the insolvent insurer], the 1978 amendment would grant the Fund preferred status against those proceeds and all other assets in insolvencies governed by the Uniform Act."

That statement certainly suggests a belief by the Court that, if the proceeding had been governed by the Uniform Act, of which the 1978 amendment was considered to be a part, the amendment would be applicable, and, notwithstanding its enactment long after the commencement of the proceeding, would give the Fund a priority status. In context, of course, that statement is clearly not a holding, but merely *dicta* offered *ex cathedra* and without any discussion of the issue raised here. We do not know if the point was even argued before the Court. Under the circumstances, we do not regard it as helpful precedent.

The Commissioner's position is grounded on § 156 which, as noted, states that, "unless otherwise directed by the court," the "rights and liabilities" of the creditors and others interested in the insolvent estate are "fixed" as of the date the liquidation order is filed. Ignoring the caveat, he regards those rights as irretrievably fixed and thus views any attempt to create new preferences after that date as affecting substantive and vested rights. *Au contraire*, says MIGA: the reordering of priorities or preferences in a pending insolvency proceeding is remedial only and does not affect substantive or vested rights.

Most of the cases in this area arose under the pre-1978 Federal bankruptcy laws, which espoused the same principle as § 156, *i.e.*, "the rights of the creditors of a bankrupt become fixed on the date of the filing of the bankruptcy petition." *In re Hansen Bakeries*, 103 F.2d 665, 666–67 (3d Cir.1939); *In re Tampa Wholesale Electric, Inc.*, 409 F.2d 501 (5th Cir.1969). In enacting the current bankruptcy law, Congress made clear that, as a general rule, the new law would *not* apply to pending proceedings—that a case commenced under the former law "and all matters and proceedings in or relating to any such case, shall be conducted and

determined under [the former law] as if this Act had not been enacted." P.L. 95–598, § 403(a). That was not always the case under the former law, however. In enacting certain amendments to the 1898 statute, Congress indicated a contrary intent, that the amendments should apply to pending proceedings. Given that intent, the question was raised of whether those amendments could validly be so applied where the effect of doing so would be to reorder the priorities among creditors.

An early case adopting the view that the new law could be so applied is *City of Chelsea v. Dolan,* 24 F.2d 522 (1st Cir.), *cert. denied* 277 U.S. 606, 48 S.Ct. 602, 72 L.Ed. 1012 (1928). The debtor was adjudicated bankrupt in April, 1926; it owed taxes to the City of Chelsea and wages to its employees but did not have sufficient resources to pay both. As of the date of adjudication, taxes had a priority over wages; however, a new law, which became effective in August, 1926, gave wages a priority over taxes. The Court applied the new law, which it regarded as "remedial." The town, it said, "had no lien upon or vested right in the estate for its taxes; it had nothing but a claim under the Bankruptcy Act," which, subject to the requirement of uniformity[1] Congress could "amend or repeal at [its] pleasure." *Id.,* 523. In the final passage of its opinion, the Court expressly rejected a contrary determination in *In re Photo Electrotype Engraving Co.,* 155 F. 684 (S.D.N.Y.1907), a District Court case, noting at 523: "The ruling there made, that the rights of all creditors were fixed by the law as it read when the petition was filed, was nothing but obiter dictum, and is inconsistent with the overwhelming weight of authority."

The approach taken in *City of Chelsea* was followed later in *Adams v. Bowen,* 46 F.2d 294 (1st Cir.1931); *In re Old Algiers, Inc.,* 100 F.2d 374 (2d Cir.1938); *Reconstruction Finance Corporation v. Flynn,* 175 F.2d 761 (2d Cir.), *cert. denied* 338 U.S. 859, 70 S.Ct. 101, 94 L.Ed. 526 (1949); *New*

---

1. *See* U.S. Constitution, Art. I, § 8.

*York Credit Men's Adj. Bur. v. A. Jesse Goldstein & Co.,* 276 F.2d 886 (2d Cir.1960); and *Coin Machine Acceptance Corp. v. O'Donnell,* 192 F.2d 773 (4th Cir.1951).

In *Reconstruction Finance Corporation,* the Court applied a 1948 law giving RFC a priority for certain claims to a bankruptcy proceeding commenced prior to the enactment of the law and allowed RFC's claim for priority even though the claim was not made until after the plan for reorganization had been approved. In discussing the cases cited by the trustee in opposition to that position, the Court held that "any intimation that rights vested at the time a petition in bankruptcy is filed cannot be divested by statute must be disregarded, particularly in the light of later decisions." 175 F.2d at 763.

*Coin Machine Acceptance Corp.* involved the question of whether recorded trust receipts constituted preferential transfers. The law in effect when the bankruptcy petition was filed was unclear on the issue; it was arguable that they did constitute preferential transfers and were therefore void. By subsequent legislation, Congress made clear that such trust receipts were valid, and expressed its intent that the new law apply in pending proceedings "so far as practicable." The Court applied the new law, also rejecting the argument that "general creditors acquired a vested right in the property here in question which became fixed by the adjudication of bankruptcy and that this may not be disturbed by subsequent legislation of Congress...." 192 F.2d at 777. Rather, said the Court,

> "We think there can be no question as to the power of Congress in the passage or amendment of a bankruptcy act to fix or rearrange priorities to be observed in the distribution of a bankrupt's estate, so long as the rule of uniformity is observed and there is no violation of the due process clause of the Fifth Amendment, which is manifestly not present here."

*Id.*

A similar view was taken by the Supreme Court in *Carpenter v. Wabash Ry. Co.,* 309 U.S. 23, 60 S.Ct. 416, 84

L.Ed. 558 (1940). In February, 1931, Carpenter recovered a judgment in a Missouri court against the railroad for personal injuries sustained in the course of his employment. Ten months later, the railroad was placed in receivership in Missouri. Carpenter filed his claim and sought a priority on the ground that the railroad was an Indiana corporation and Indiana law accorded a priority to his claim. The receiver and the two lower Federal Courts rejected his contention. While Carpenter's petition for *certiorari* was pending in the Supreme Court, Congress amended the law to give a priority to that type of claim. The Supreme Court applied the new law, expressing "no doubt that Congress has constitutional power to impose this requirement." *Id.*, 27, 60 S.Ct. at 418. *See also Rederiaktierbolaget v. Compania de Navegacion*, 139 F.Supp. 327 (D.C.Z.1955); *In re Berg*, 33 F.Supp. 700 (D.Minn.1940).

There are cases that express, or at first glance appear to express, a different view. *See, for example, In re C.H. Earle, Inc.*, 2 F.Supp. 15 (E.D.N.Y.1932), *aff'd per curiam* 65 F.2d 1013 (2nd Cir.), *cert. denied* 290 U.S. 674, 54 S.Ct. 92, 78 L.Ed. 582 (1933), which the Second Circuit Court of Appeals rejected in *Reconstruction Finance Corporation v. Flynn, supra,* 175 F.2d 761 at 763, and *In re Freeze-In Manufacturing Corporation,* 128 F.Supp. 259 (E.D.Mich. 1955). A number of these cases really do not state a contrary view but simply rest on a different factual predicate. *See, for example, United States v. Marxen,* 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222 (1939); *In re Hansen Bakeries, supra,* 103 F.2d 665; *In re Miller,* 25 F.Supp. 336 (S.D.N.Y.1938), *aff'd* 105 F.2d 926 (2nd Cir.1939); [2] *Rodrock*

---

**2.** *Marxen, Hansen Bakeries,* and *Miller* each involved a situation in which, after a debtor was adjudicated bankrupt, the FHA acquired by assignment a note from the debtor that was otherwise an unsecured debt, filed a claim based on the note, and sought priority status for its claim on the theory that the note was a debt owed to an agency of the United States. The courts held the law giving priority to such debts "inapplicable to general claims in bankruptcy transferred to the United States ... after the filing of the petition for the reason that the rights of creditors are fixed by the Bankruptcy Act as of the filing of

*v. Security Indus. Bank,* 642 F.2d 1193 (10th Cir.1981); and *dicta* in *In re Inland Dredging Corporation,* 61 F.2d 765 (2d Cir.1932), *cert. denied* 288 U.S. 611, 53 S.Ct. 403, 77 L.Ed. 985 (1933).

*Bradley,* as noted, viewed the issue of "manifest injustice" in terms of the nature and identity of the parties, the nature of their rights, and the impact of the change in law upon those rights. In that regard, we observed in *T & R Joint Ven.* that

> " 'manifest injustice' must be viewed in a more or less composite fashion, and not *solely* from the perspective of one party. A benefit conferred on one party by a new law is, at the same time, a benefit taken from the other. Thus, whatever the court does will inevitably favor one side or the other. To apply the new law is to favor the party whom the lawmaker desired to be favored; to refrain from applying it is to favor his adversary with a benefit that the law has sought to remove from him. Against that, however, the court must always consider and give special weight to the detrimental impact of removing the benefit/detriment of the old law—that which presumably guided the conduct of the parties—for at some point there lurk the protective constraints of due process."

*Id.* [47 Md.App. at], 408, 424 A.2d 384.

The bankruptcy cases made clear that insolvency laws are remedial in nature, and that, while creditors may develop expectations of what they might receive under those laws, they do not acquire vested rights to particular modes of distribution that are beyond the power of Congress to alter. *See also Hooter v. Wilson,* 273 So.2d 516 (La.1973); *Mechanics' & Farmers' Bank,* 31 Conn. 63 (1862); *Bigelow v. Pritchard,* 21 Pick. 169 (Mass.1839). The caveat in § 156 is consistent with that notion. If it can be "otherwise directed

---

the petition in bankruptcy." *United States v. Marxen, supra,* 307 U.S. at 207, 59 S.Ct. at 815. That is, of course, quite a different matter than a legislative reordering of priorities.

by the court," the rights of the creditors cannot be regarded as so irretrievably fixed as to be beyond alteration.

On this analysis, we find no manifest injustice in applying § 158A to the instant proceeding and thus, under either a *Janda* or *Bradley* approach, we conclude that it should be so applied. It follows, then, that the Circuit Court erred in directing otherwise.

## II. *Application of § 161*

The provisions in art. 48A dealing with the rehabilitation and liquidation of insurance companies first came into the Code through emergency legislation in 1933. 1933 Md. Laws (Spec.Sess.), ch. 40. They assumed their present form in 1963, when the last comprehensive revision of the insurance laws was effected. 1963 Md.Laws, ch. 553.

MIGA did not exist when the 1963 law was enacted. Thus, when a liability insurer became insolvent and was placed in receivership, the only recourse against the insurer by persons having claims against its policyholders was a claim in the receivership proceeding. Section 160 deals with that matter. Though subsection (a) generally prohibits the filing of contingent or unliquidated claims, subsection (b) permits "any person who has a cause of action against an insured of such insurer under a liability insurance policy" to file a claim in the liquidation proceeding, notwithstanding that the claim may be contingent. It further provides that such a claim may be allowed if (1) from proof presented upon the claim, it may be reasonably inferred that the claimant would be able to obtain a judgment upon his cause of action against the insured, (2) proof is furnished "that no further valid claim against [the] insurer arising out of his cause of action other than those already presented can be made," and (3) the insurer's total liability for the act of its insured does not exceed the liability it would have if it were not in liquidation. Those claims, however, must be filed within the time specified pursuant to §§ 149(2) and 161(b). Indeed, the truncated statute of limitations provided for in § 161(b) was no doubt the reason for the special provision in

§ 160(b) allowing that type of contingent, unliquidated claim to be filed.

The creation of MIGA provided a substitute, and preferred, resource for the payment of liability claims, but it did not change the requirements set forth in §§ 149, 160, or 161 for filing a claim in the liquidation proceeding if direct resort to the insolvent insurer's assets is sought.  Indeed, the law still looks to claimants initially filing their claims in the liquidation proceeding.  This is implicit both from the fact that §§ 149, 160 and 161 remain in effect, unamended, as well as from § 509(c) of art. 48A, requiring that MIGA's Plan of Operation establish procedures for the filing of claims with MIGA and, in that connection, providing that "[n]otice of claims to the receiver or liquidator of the insolvent insurer shall be deemed notice to [MIGA] or its agent and a list of such claims shall be periodically submitted to [MIGA] by the receiver or liquidator."

The problem, it appears, was created by § 512(a) of art. 48A, providing that,

> "Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this subtitle shall be reduced by the amount of any recovery under such insurance policy."

Section 512 was enacted in 1971 as part of the MIGA law; as noted, it served as the basis for MIGA's initial rejection of claims for which uninsured motorist benefits were available.  Because there is no counterpart language in title 10 of art. 48A dealing with the liquidation proceeding, it would seem that, while claimants may be precluded from recovering against MIGA until their rights to uninsured motorist benefits are exhausted, they are not precluded from making a full claim in the liquidation proceeding.  That, indeed, is what the law requires they do.  They may then proceed, first, to recover any available uninsured motorist benefits,

and, second, to recover, subject to policy limits and conditions and any statutory deductible, the balance of their claim from MIGA.

This procedure fully protects the rights of third-party claimants, which was one of the chief purposes of MIGA. The uncertainty of recovery against the insolvent insurer is shifted to MIGA and, to the extent otherwise permitted, to the insurers paying the uninsured motorist benefits, who, to the extent of their respective payments, acquire by subrogation the rights of the initial claimants. The Legislature clearly was aware that, by such a process, MIGA would be unable to file its subrogation claim by the time fixed for filing other claims. It therefore provided in § 511(c) for MIGA to "periodically file with the receiver or liquidator of the insolvent insurer statements of the covered claims paid by [MIGA] and estimates of anticipated claims on [MIGA] which shall preserve the rights of [MIGA] against the assets of the insolvent insurer." [3]

Unfortunately, until 1979, the Legislature made no similar provision for the insurers paying uninsured motorist benefits although those insurers were in somewhat the same position as MIGA. Indeed, until 1979, the statute was altogether silent as to the rights of such insurers. By 1979 Md.Laws, ch. 437, enacting amendments to art. 48A, § 505(c), the Legislature prohibited those insurers from pressing their subrogated claims against insureds of an insolvent company but expressly recognized their right to assert the claims against the receiver.[4] That latter provision, we think, was simply a recognition of a right the insurers already had and not the creation of a new right.

---

**3.** In 1978, in a companion bill to that which enacted § 158A, the General Assembly authorized the receiver to advance funds to MIGA for the payment of claims. *See* 1978 Md.Laws, ch. 799, enacting art. 48A, § 162A.

**4.** As introduced, the bill would also have permitted the claims to be made against MIGA, but that provision was deleted before enactment.

The lack of any special provision as to when these claims could be filed is what produces the instant dispute. How is the right of these insurers to seek recompense in the liquidation proceeding to be squared with the rigid time requirements of §§ 149(2) and 161(b) when their right to recompense does not even arise until, at the earliest, they are presented with a claim for uninsured motorist benefits?[5]

The answer, we think, lies in the fact that the insurer's right to seek recompense in the liquidation proceeding is not an independent right, but a subrogated one. To the extent it has paid uninsured motorist benefits, the insurer stands in the shoes of its insured and succeeds to his claim. That is the essence of subrogation. As stated in Sheldon, *The Law of Subrogation*, § 1, quoted in *Schnader, Inc. v. Cole Build. Co.*, 236 Md. 17, 22, 202 A.2d 326 (1964), "[i]t is a substitution, ordinarily the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." Subrogation operates as " 'an assignment in equity of the debt and all legal proceedings upon it....,' " including, indeed, any preference held by the creditor. *Orem v. Wrightson*, 51 Md. 34, 43 (1879) (citation omitted); *accord Northwestern Nat'l Ins. v. Goldstein*, 35 Md.App. 30, 368 A.2d 1095 (1977); 73 Am.Jur.2d *Subrogation*, §§ 106, 107.

As an incident of this substitution, a subrogee stands in the creditor's shoes with respect to rights of action possessed by the creditor. Although that may work to his

---

5. We need not decide here whether the right to make claim in the liquidation proceeding arises when the insurer is presented with a claim for uninsured motorist benefits or later, when it actually pays those benefits. *See*, however, *Maryland Trust Co. v. Poffenberger*, 156 Md. 200, 206, 144 A. 249 (1929), holding that "to entitle the surety to subrogation to the creditor's rights, there must be a payment of the debt by the surety. Until there is a payment of the debt, the surety is not entitled to be substituted to the rights of the creditor." In either event, if the claim is regarded as a new one, the likelihood of the insurer's being able to file it within the time specified in the liquidation order is remote.

detriment if a statute of limitations has already run against the creditor (*see* Annot., *Statute of Limitations—Subrogated Insurer,* 91 A.L.R.3d 844 (1979)), it may work to his benefit if the creditor in whose shoes he stands has already filed a timely claim. Thus, in Annot., *Bringing in Party— Limitations,* 8 A.L.R.2d 6, 97 (1949), it is stated:

"Persons entitled to subrogation to a right of action are entitled to intervene for the purpose of assisting the persons to whose interest they are subrogated or of taking such other action as may be essential to protect their right, *even though a direct action would be barred by the statute of limitations.*"

(Emphasis added.) *See also* 73 Am.Jur.2d *Subrogation,* § 129: "Defenses which would not have been available against the creditor or obligee cannot, as a rule, be interposed against the subrogee, *including the defense of limitations.*" (Emphasis added); *Smith v. Davis,* 71 W.Va. 316, 76 S.E. 670 (1912).

This approach, which comports with the general nature of a subrogee's rights and status, also permits a harmonizing of the insurer's right to pursue a claim in the liquidation proceeding with the limitations period set forth in §§ 149(2) and 161(b). To the extent of its payment, the insurer succeeds to the rights of its insured: if the insured has filed a timely claim, the insurer may pursue it; if the insured failed to file a timely claim, the insurer is out of luck.

The ruling of the Circuit Court is inconsistent with this approach. It may be that some (or all) of the insureds filed timely claims in the liquidation proceeding, and, to the extent that they did, their insurers would not be barred from pursuing those claims to the extent of their respective interests therein.

JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.