750 A.2d 646

**Charles IGWILO, et al.**

**v.**

**PROPERTY & CASUALTY INS. GUARANTY CORPORATION, et al.**

**No. 727, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

April 27, 2000.

630

Kathleen Howard Meredith (Stephan Y. Brennan and Iliff & Meredith, P.C., on the brief), Baltimore, for appellants.

Andrew Janquitto (Mudd, Harrison & Burch, on the brief), Towson, for appellees.

Argued before THIEME, BYRNES and JAMES S. GETTY (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

Appellants, Charles Igwilo and Uchechukwu Angela Igwilo, are the parents of an infant daughter, appellant Ozioma A. Igwilo. Mr. and Mrs. Igwilo were the plaintiffs in a medical malpractice case ("*Igwilo I*") against Dr. Maria Y. Que in the Circuit Court for Baltimore City. Dr. Que was insured by the P*I*E Mutual Insurance Company ("P*I*E"), which was adjudged insolvent after *Igwilo I* was filed. Subsequent to P*I*E's insolvency, the Property and Casualty Insurance Guaranty Corporation ("PCIGC"), appellee, provided a defense to Dr. Que in *Igwilo I*. *Igwilo II* was filed, also in the

Circuit Court for Baltimore City, to obtain a judicial declaration as to how many "covered claims" the Igwilos had asserted in *Igwilo I.*

In *Igwilo II,* the Igwilos filed a motion for summary judgment in which they sought a declaration that they had three "covered claims." PCIGC sought a declaration that the Igwilos had only one "covered claim." The court granted the Igwilos' motion for summary judgment, but found that they had two "covered claims." Appellants appeal from that determination and present the following questions, which we have rephrased in the interest of clarity, for our review:

1. Did the court err in determining that the Igwilos had two "covered claims"?

2. May Mr. and Mrs. Igwilo recover damages for loss of services and pre-majority medical expenses for their infant daughter?

We answer "no" to the first question and "yes" to the second question, and affirm.[1]

## *Facts*

In their complaint, the Igwilos asserted that Dr. Que committed medical malpractice by not properly treating Mrs. Igwilo while she was pregnant. The complaint alleged that after a prenatal examination on August 10, 1996, Dr. Que

---

**1.** PCIGC filed a cross-appeal in this case which raises two issues. First, PCIGC contends that the Igwilos' claims should have been aggregated into one "covered claim" rather than two "covered claims." This issue is essentially PCIGC's position regarding the first question presented in the Igwilos' appeal. Therefore, we address the general issue of how many "covered claims" are before the trial court without regard to whether the discussion is in the context of the Igwilos' appeal or PCIGC's cross-appeal.

Second, PCIGC "noted the cross-appeal out of an abundance of caution to protect its rights because the Igwilos have contended ... that the trial court's memorandum supports their position and is controlling. The PCIGC perfected the appeal to preserve the issue of whether a trial memorandum super[s]edes or explains the trial court's order." As our discussion in this opinion will reveal, it is not necessary to address this issue. Although the court's order and memorandum opinion slightly differ in their respective analyses, both reach the ultimate conclusion that the Igwilos have two "covered claims."

failed to diagnose Mrs. Igwilo with preeclampsia. As a result of Dr. Que's malpractice, on August 25, 1996, Ozioma A. Igwilo, the Igwilos' child, was born with severe and irreversible brain damage.

The Igwilos further asserted that Mrs. Igwilo suffered various physical symptoms and problems that would not have occurred but for Dr. Que's negligence. These symptoms included pain, severe swelling of the face and extremities, headache, epigastric pain, progression of the disease from mild preeclampsia to severe preeclampsia to severe toxemia, and performance of an emergency cesarean section because her condition was too far advanced to respond to drug therapy and other conservative measures.

As parents and next friends of Ozioma Igwilo, Mr. and Mrs. Igwilo sought damages as a result of the child's bodily injuries. In addition, the parents in their individual capacities sought recovery of damages that they suffered because of Ozioma's injuries. The parties dispute whether the complaint also sought compensation for damages arising out of the bodily injuries to Mrs. Igwilo.

Dr. Que was insured by P*I*E under a policy that provided liability coverage of $1,000,000.00 for "each claim" and $3,000,-000.00 as an "annual aggregate." P*I*E was adjudged insolvent, and PCIGC stepped in to defend and indemnify Dr. Que. Thereafter, a dispute arose between the Igwilos and PCIGC concerning the number of "covered claims" presented by the Igwilos in their complaint against Dr. Que. Specifically, the Igwilos contended that they had asserted three "covered claims," one for Mr. Igwilo, one for Mrs. Igwilo, and one for Ozioma Igwilo. PCIGC denied separate coverage for each of these claims and, instead, asserted that the claims aggregated to form one "covered claim." The Igwilos brought the declaratory judgment action (*Igwilo II*) to have the court determine the number of "covered claims" implicated by their complaint in the underlying tort action (*Igwilo I*).

The court ruled that the Igwilos had asserted "two separate, distinct 'covered claims' " in the underlying medical malpractice action. In its memorandum opinion, the court stated:

The court finds that the language of Md.Code Ann., Ins. Art., § 9–302 and § 9–306 applies to any "covered claim" that may result from the negligence of the insured and existing on or before insolvency of insurer. In the case sub judice, Plaintiffs assert two separate distinct "covered claims" that arose as a result of the alleged negligence of Dr. Que, both of which existed before insolvency of P\*I\*E.

The parents' claim for injuries sustained by the mother, with resultant damage to marital relationship, and loss of child's services comprise one "covered claim," and the child's claim for injuries sustained as a result of the claimed negligence constitute the second "covered claim." Therefore, these two claims are each considered a "covered claim" within the meaning of Md.Code Ann., Ins. § 9–306.

In its order, the court held:

The PCIGC's obligation, therefore, is to provide liability coverage up to $299,900 for each of the two "covered claims," asserted in the underlying litigation, i.e.: a) the injury to the child and all claims that are caused by, derive from or arise out of that bodily injury; and b) the injury to the mother and all claims that are caused by, derive from or arise out of that bodily injury.

The Igwilos appeal from the court's order, contending that the court erred in failing to find that they set forth three "covered claims" in their complaint. PCIGC has cross-appealed, arguing that the court erred in failing to find that the Igwilos' complaint set forth a single "covered claim." [2]

### Discussion

### Standard of Review

The Court of Appeals has stated that "the proper standard for reviewing the granting of a summary judgment motion

---

**2.** PCIGC concedes, however, that, if the Igwilos set forth a separate cause of action for Mrs. Igwilo's personal injuries, the Igwilos actually have two "covered claims." If that is the case, then PCIGC argues that the trial court's judgment should be affirmed.

should be whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 592, 578 A.2d 1202 (1990) (citations omitted). The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact that is sufficiently material to be tried. *See Coffey v. Derby Steel Co.*, 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia*, 287 Md. 302, 304, 413 A.2d 170 (1980). Thus, pursuant to Maryland Rule 2–501(e), summary judgment is appropriate only if there is no dispute of material fact and the party in whose favor judgment is entered is entitled to judgment as a matter of law. *See, e.g., Murphy v. Merzbacher*, 346 Md. 525, 531, 697 A.2d 861 (1997); *Bowen v. Smith*, 342 Md. 449, 454, 677 A.2d 81 (1996); *Rosenblatt v. Exxon Company, U.S.A.*, 335 Md. 58, 68, 642 A.2d 180 (1994); *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 572, 723 A.2d 502, *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

The summary judgment motion before the trial court involved the interpretation of a statute. This Court has held that the "interpretation of a statute presents a question of law." *Papillo v. Pockets, Inc.*, 119 Md.App. 78, 83, 704 A.2d 448 (1997). Neither party contends that any material facts were in dispute; therefore, we will review the trial court's decision *de novo* "to determine whether the court reached the correct legal result." *Nicholson Air Services, Inc. v. Board of County Com'rs of Allegany County*, 120 Md.App. 47, 62, 706 A.2d 124 (1998).

### *Relationship Between P\*I\*E and PCIGC*

PCIGC was created by the Maryland Legislature as a "remedy for the particular societal malady caused by defunct insurance carriers." *Joe Shifflet, Inc. v. PCIGC*, 77 Md.App. 706, 709, 551 A.2d 913 (1989). Under the statutory scheme, discussed in greater detail below, PCIGC supplants the insolvent insurer to fulfill "the obligations that the insolvent insurer should have fulfilled." *Id.* at 710, 551 A.2d 913. PCIGC thus "stands in the shoes of the insolvent insurer and[,] subject to applicable policy limits and conditions, is liable for

'covered claims' that could have been brought against the insurer." *McMichael v. Robertson,* 77 Md.App. 208, 214, 549 A.2d 1157 (1988); *see also Maryland Ins. Guar. Ass'n v. Muhl,* 66 Md.App. 359, 361, 504 A.2d 637 (1986).

The Insurance Article of the Maryland Code sets forth the obligations of PCIGC. Section 9–302 provides that the purposes of the subtitle are:

> (1) to provide a mechanism for the prompt payment of covered claims under certain policies and to avoid financial loss to residents of the State who are claimants or policyholders of an insolvent insurer; and (2) to provide for the assessment of the cost of payments of covered claims and protection among insurers.

The powers and duties of PCIGC are provided in § 9–306. Section 9–306(a)(1) provides that, subject to a statutory cap, PCIGC is "obligated to the extent of the covered claims existing on or before the determination of the insolvency" or to certain covered claims that arise after the insolvency. Section 9–306(a)(2) provides that PCIGC's obligation "shall include only that amount of each covered claim that is in excess of $100 and less than $300,000." The statute further provides that PCIGC "is not obligated to a policy holder or claimant in an amount in excess of the obligation of the insolvent insurer under the policy out of which the claim arises." § 9–306(a)(4). The trial court and all parties agreed that PCIGC's maximum liability per "covered claim" is $299,-900.00.

Clearly, the concept of a "covered claim" is central to this statutory scheme. Section 9–301(d) defines a "covered claim" as "an insolvent insurer's unpaid obligation ... that ... arises out of a policy of the insolvent insurer." Therefore, to determine whether a claim constitutes a "covered claim" under the statute, we must examine the language of the underlying insurance policy between PCIGC and the insolvent insurer. The insolvent insurer's obligation under its policy to the insured determines the insurer's "unpaid obligation," which in turn determines what constitutes a "covered claim." As ap-

plied in this case, P*I*E's obligation to Dr. Que under its insurance policy constitutes its "unpaid obligation." PCIGC's obligation to pay a "covered claim" subject to the statutory cap is therefore the same as P*I*E's original contractual obligation under its policy with Dr. Que.

### P*I*E Insurance Policy

■ Under the policy issued to Dr. Que, P*I*E's obligation is limited by the Limits of Liability provision applicable to "each claim."

> The Limit of Liability stated in the General Declarations, as applicable to "each claim," is the limit of [P*I*E's] liability for all damages because of any one claim or suit or all claims or suits first made during the Policy period because of injury to or death of any one person....

Thus, as it applies to this case, P*I*E's liability is limited to $1,000,000.00 "for all damages because of ... all claims or suits ... because of injury to ... *any one person.*" (Emphasis added.)

On appeal, PCIGC argues that, "[r]egardless of the number of claims or tort claimants, if there is one bodily injury, only one 'each claim' limit applies to all claims related to that bodily injury. Regardless of the number of claims or tort claimants, if there is one bodily injury, the most P*I*E Mutual was obligated to pay for *all* those claims was $1,000,000." (Emphasis in original.) On the contrary, the Igwilos contend that the word "each" in the liability limitation means that every claim is individually subject to the liability cap, regardless of whether the claims all relate to or arise from bodily injury to one person. The Igwilos further contend that, under the Section II, Paragraph 2 of the policy, any additional claims for damages resulting from the same injury are considered separate claims. Upon reviewing the statute, the underlying insurance policy, and applicable case law, we reject the Igwilos' contention and agree with PCIGC.

■ As the Court of Appeals recognized in *Daley v. United Services,* 312 Md. 550, 553, 541 A.2d 632 (1988),

"[u]nder policies fixing a maximum recovery for 'bodily injury' to one person, the vast majority of courts have held that such a 'per person' liability limitation applies to all claims of damage flowing from such bodily injury." (Citing Annotation, *Construction and Application of Provision in Liability Policy Limiting the Amount of Insurer's Liability to One Person*, 13 A.L.R.3d 1228, 1234 (1967 & Supp.1987).) In such circumstances, "all damage claims, direct and consequential, resulting from injury to one person, are subject to the limitation." 13 A.L.R.3d at 1234 (1967 & Supp.1999). Indeed, courts have "uniformly" taken the position that "the limit as to recovery for the bodily injuries of one person limits all recovery for damages consequential on that bodily injury, regardless of the fact that such damages are claimed by one who himself suffered bodily injury." 13 A.L.R.3d at 1240 (1967).

In *Daley,* the insurance policy at issue contained limitations quite similar to the one in this case:

Limits of Liability: The limit of bodily injury liability stated in the Declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of service, arising out of bodily injury sustained by one person as the result of any one occurrence.

\* \* \*

Coverage—Limits of Liability

A. Bodily Injury Liability each person—$100,000.00—Each Occurrence—$200,000.00.

*Daley,* 312 Md. at 552, 541 A.2d 632.

After reviewing the language of the policy in *Daley,* the Court summarized the insurer's obligation:

[The obligation] was subject to two limits: (1) a $100,000 "each person" limit for all damages, including damages for care and loss of services arising out of bodily injury sustained by one person as the result of any one occurrence; and (2) a $200,000 "each occurrence" limit for all such

damages arising out of bodily injuries sustained by two or more persons as a result of any one occurrence.

*Daley*, 312 Md. at 552, 541 A.2d 632. The Court later pointed out that "[w]here state law creates a right to damages for mental anguish suffered by those in specified relationships to the person who suffers bodily injury or death, it has been held that the damages for mental anguish are, in effect, derivative of the single bodily injury." *Id.* at 554, 541 A.2d 632.

The provision in the underlying insurance policy in this case is strikingly similar to that in *Daley*. The Limits of Liability provisions divide P*I*E's liability into two categories: (1) "each claim" liability, which applies when one person has died or been injured, and (2) "annual aggregate" liability, which "is the total limit of [P*I*E's] liability for all damages and for all claims first made during the effective Policy period, subject to the above provisions respecting 'each claim'" liability. Thus, the $1,000,000.00 cap in the insurance policy represents the maximum liability for all claims arising from the death of or injury to one person, regardless of the number of claims that arise out of that injury.

The Igwilos' reliance on Section II, Paragraph 2, of the P*I*E insurance policy is unpersuasive. That provision states: "If any claim is first made during the Policy period alleging injury to an individual that would be covered by this Policy, any additional claim made for damages resulting from the same injury shall be considered a claim hereunder." As the Court of Appeals has recognized, "[u]nder Maryland law, when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself." *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 779, 625 A.2d 1021 (1993); *see also Kendall v. Nationwide*, 348 Md. 157, 166, 702 A.2d 767 (1997) ("We have repeatedly held that the construction of insurance contracts in Maryland is confined to the few well-established principles that are applied to the construction of contracts generally."). Moreover, "particular provisions of a contract are not to be read in isolation but rather the document is to be

read as a whole to discover its true import." *Simkins Indus., Inc. v. Lexington Ins. Co.*, 42 Md.App. 396, 404, 401 A.2d 181, *cert. denied*, 285 Md. 730 (1979); *see also Klein v. Fidelity*, 117 Md.App. 317, 331–32, 700 A.2d 262 (1997), *cert. denied*, 348 Md. 333, 703 A.2d 1265 (1998).

The fundamental flaw in the Igwilos' reliance on Section II, Paragraph two, of the P*I*E policy is that the provision does not stand in isolation; rather, it must be read in conjunction with the Limits of Liability provision in the policy. Although each of the claims arising from an injury to one person constitute a separate claim under the policy, liability for each of these claims is limited to *all damages* because of *all claims* arising out of injury to any one person. Therefore, even though the claims are "separate," liability is capped for all claims resulting from the same injury. That cap constitutes the insurer's obligation under the policy, which then becomes a "covered claim" under Md.Code § 9–301(d). We simply note that determining what constitutes a "claim" under the policy does not resolve the issue of what constitutes a "covered claim" under the statute.

As all parties agree, the central issue in this appeal involves a dispute over the number of "covered claims" that are before the trial court. Indeed, the declaratory judgment action (*Igwilo II*) was filed to resolve that very issue. The Igwilos contend that there are three "covered claims" before the trial court, whereas PCIGC contends that the Igwilos' separate claims for relief aggregated into a single "covered claim." As we discuss below, we find that the lower court correctly determined that the Igwilos presented two "covered claims." [3]

---

3. The trial court in *Igwilo II* specifically stated that "[t]his declaratory judgment is confined solely to the issue of the number of 'covered claims' that are asserted by the Igwilos in [*Igwilo I*]. This declaratory judgment does not attempt to adjudicate or address the merits of the [Igwilos'] claims in the underlying litigation [*Igwilo I*]." Likewise, this Court will not address the merits of the Igwilos' claims. As PCIGC points out in its brief to this Court, "[t]he proper forum for the issue of whether the Igwilos have a cause of action for [non-economic] damages arising out of the non-fatal bodily injury of their child is the medical malpractice action brought by them against Dr. Que."

## I. Injury to the Child, Ozioma Igwilo

All parties agree that the claimed physical injury to Ozioma Igwilo constitutes a "covered claim." Thus, the $1,000,000.00 limitation on liability in the P*I*E insurance policy would have applied to Ozioma's claims for damages, *as well as* all claims that arose because of Ozioma's bodily injury.[4] As we discuss in greater detail below, the claims of Mr. and Mrs. Igwilo for economic and non-economic damages resulting from their child's injury are subject to the same liability cap as Ozioma's injuries, as they are all claims arising out of an injury to one person and do not constitute separate "covered claims" subject to separate liability caps. Regardless of the number of tort claims arising from the child's bodily injury, the most P*I*E* would have been obligated to pay under the policy would have been the $1,000,000.00 "each claim" limit. Thus, the most the PCIGC is obligated to pay is $299,900.00 for all tort claims arising from the child's injuries.

## II. Injury to the Parents,

### Uchechukwu Angela Igwilo and Charles Igwilo

Although the parties agree that the claim for injury to Ozioma Igwilo constitutes a "covered claim," the Igwilos and PCIGC sharply dispute whether the Igwilos' claims for injuries to Mr. and Mrs. Igwilo constitute separately "covered claims." Specifically, the parties disagree as to the following issues: (1) whether Mrs. Igwilo set forth a claim for her own physical injuries independent of Ozioma's physical injury; (2) whether Mr. and Mrs. Igwilo can recover economic and non-economic damages resulting from injury to Ozioma; and (3) whether the parents' claims for economic and non-economic damages constitute a "covered claim" separate from the bodily injury claim(s).

---

4. Because P*I*E has become insolvent, PCIGC will now assume that obligation, subject to the statutory cap provided in the Maryland Code, § 9–306(a)(2).

### A. Bodily Injury to Mrs. Igwilo

█ PCIGC argues that "the complaint in the underlying tort action sought damages for one bodily injury (the child's)." If this is the case, then PCIGC's potential liability would be limited to a total of $299,900.00 for the child's injury and all tort claims arising from that injury, as we have previously discussed, and PCIGC would not be liable at all for any physical injury to Mrs. Igwilo. PCIGC concedes, however, that, "if the complaint in the underlying tort action sought damages because of two independent bodily injuries (one to the mother and one to the child), then the trial [court] was correct in its ruling that there were two 'covered claims.'" The Igwilos maintain on appeal that their complaint in *Igwilo I* did assert a claim and sought damages "for the 'physical pain' and other damages" arising from Dr. Que's negligence. To resolve this issue, we must examine the Igwilos' initial complaint in *Igwilo I*.

In count one of the complaint, Mr. and Mrs. Igwilo, "on behalf of their infant child," sought damages for Ozioma's physical, emotional, and economic injuries. Prior to detailing Ozioma's injuries, count one chronicled Mrs. Igwilo's pregnancy with Ozioma, including a description of the physical pain and other symptoms she experienced during her pregnancy. The Igwilos stated in count one that Mrs. Igwilo suffered pain, severe swelling of the face and extremities, headache, epigastric pain, severe preeclampsia, severe toxemia, and an emergency cesarean section. The Igwilos did not seek damages for Mrs. Igwilo's physical pain and suffering in count one; rather, the relief sought was limited to damages for Ozioma Igwilo's injuries.

In count two, however, the Igwilos made a "claim for their individual damages, expenses and losses against" Dr. Que. In detailing their damages in count two, the Igwilos explicitly asserted that "[t]he plaintiffs [Mr. and Mrs. Igwilo] . . . have in the past, are presently, and will in the future suffer physical pain . . . ." The Igwilos also incorporated "by reference each and every allegation set forth [in count one] above, as though

fully restated" in count two. We hold that the complaint sufficiently set forth a claim for Mrs. Igwilo's physical injury.[5] Therefore, under the insurance policy and the PCIGC statute, Mrs. Igwilo's physical injury amounted to a second "covered claim," independent of Ozioma's claim for bodily injury. Accordingly, we affirm the court's judgment that the "claim for injuries sustained by the mother, with resultant damage to the marital relationship" constituted a second "covered claim."

### B. Parents' Claims for Economic and Non-economic Damages

Both Mr. and Mrs. Igwilo asserted claims for economic and non-economic damages resulting from Ozioma's injury. Specifically, they asserted damages for pre-majority medical expenses and the loss of their infant daughter's services. As the Igwilos state in their brief to this Court, "Mr. Igwilo [and] Mrs. Igwilo ... had 'separate and distinct' claims against an alleged tortfeasor, Dr. Que, resulting, *inter alia*, from physical injuries to a minor child...."

On appeal, the Igwilos argue that "[p]arents of a minor child injured by someone's negligence have 'separate and distinct' claims for 'legally cognizable damages' ... that may either be joined in a single action with the minor child's claim or filed as separate actions." *See Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 689, 697 A.2d 1358 (1997); *Garay v. Overholtzer*, 332 Md. 339, 354–55, 631 A.2d 429 (1993). Thus, the Igwilos maintain, the claims of Mr. and Mrs. Igwilo for economic and non-economic damages resulting from Ozioma's injury are separately "covered claims." We disagree with the Igwilos' conclusion.

Whether the parents' claims for economic and non-economic damages constitute claims "separate" from Ozioma's is immaterial in this case; as our previous discussion demonstrates, they do not constitute separate *"covered* claims" under the

---

**5.** Accordingly, the Igwilos need not "amend the complaint," as PCIGC suggests, to "assert a claim by Mrs. Igwilo to recover damages for any independent bodily injury she may have suffered...."

insurance policy and the statute. The Igwilos' argument fails, therefore, because it does not take into account the terms of the policy. Mr. and Mrs. Igwilo's claims are derived from Ozioma's bodily injury; this is precisely the type of claim that, while legally distinct, is essentially combined with the claim for "injury to or death of any one person" to constitute one "unpaid obligation" under the policy and, therefore, one "covered claim" under the statute.

We find that Mr. and Mrs. Igwilo may be able to recover economic and non-economic damages resulting from bodily injury to Ozioma and to Mrs. Igwilo.[6] That recovery is limited, however, by the terms of the insurance policy and the statute governing PCIGC. The claim for damages for Ozioma's injury and all of the claims that derive from it (including the parents' claims for pre-majority medical expenses and loss of services) constitute one "covered claim." PCIGC's liability for that "covered claim" is therefore limited by a single statutory cap. Similarly, all claims derived from the independent bodily injury to Mrs. Igwilo, including the claim for loss of consortium, constitute the second "covered claim." Thus, a second liability cap applies to this "covered claim." Accordingly, we affirm the trial court's judgment that "PCIGC's obligation ... is to provide liability coverage up to $299,900 for each of the two 'covered claims,' asserted in the underlying litigation...."[7]

---

**6.** We reiterate that we will not address the merits of the Igwilos' claims in this opinion. We simply hold that recovery on their two "covered claims" is permissible, subject to the statutory cap.

**7.** The trial court's order properly stated that the two "covered claims" were: "a) the injury to the child and all claims that are caused by, derive from or arise out of that bodily injury; and b) the injury to the mother and all claims that are caused by, derive from or arise out of that bodily injury." In its memorandum opinion, however, the court stated that "[t]he parents' claim for injuries sustained by the mother, with resultant damage to marital relationship, *and loss of child's services* comprise one 'covered claim,' and the child's claim for injuries sustained as a result of the claimed negligence constitute the second 'covered claim.'" (emphasis added). Based on our discussion, the court's division of the claims in the order, not the memorandum

*Conclusion*

We hold that the Igwilos asserted two "covered claims" in their complaint in the underlying tort action. Accordingly, we affirm the judgment of the lower court.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

o

opinion, was correct; the loss of services is derived from the child's injury and therefore is part of the "covered claim" resulting from Ozioma's bodily injury and not the bodily injury to Mrs. Igwilo. The court's erroneous statement in its memorandum opinion is immaterial, however, as we affirm the court's final conclusion, consistent in the order and the opinion, that the Igwilos have two "covered claims" under the insurance policy and the statute.