550 S.E.2d 660

**WEST VIRGINIA INSURANCE GUAR-
ANTY ASSOCIATION, an Unincorporat-
ed Legal Entity, Plaintiff Below, Appel-
lee,**

v.

Marlyn POTTS, Allan N. Potts, Stacey
Potts, Erin Potts, Kristin Potts, Robert
L. Cross, M.D., and Thoracic & Cardio-
vascular Surgery, Inc., a Corporation,
Defendants Below.

Maryln Potts, Alan N. Potts, Stacey Potts,
Erin Potts, and Kristin Potts, Defen-
dants Below, Appellants.

No. 28856.

Supreme Court of Appeals of
West Virginia.

Submitted June 6, 2001.

Decided July 3, 2001.

Cheryl Lynne Connelly, Esq., Campbell, Woods, Bagley, Emerson, McNeer & Herndon, P.L.L.C., Huntington, West Virginia, Attorney for Virginia Insurance Guaranty Association.

Scott S. Blass, Esq., James B. Stoneking, Esq., Christopher J. Regan, Esq., Bordas, Bordas & Jividen, Wheeling, West Virginia, Attorneys for Potts.

Robert L. Greer, Esq., and F. James Foley, Esq., Michael Thomas, Esq., National Conference of Insurance Guaranty Funds, for Amicus Brief.

MAYNARD, Justice:

Appellants, Marlyn Potts, Alan Potts, Kristen Potts, Erin Potts, and Stacey Potts (the Pottses), appeal the June 26, 2000 order of the Circuit Court of Ohio County, West Virginia, which granted summary judgment to the appellee, West Virginia Insurance Guaranty Association (WVIGA). The appellants contend they presented five claims, rather than one aggregate claim, for payment pursuant to the West Virginia Insurance Guaranty Association Act (the Guaranty Act), W.Va.Code §§ 33–26–1 to 19. We agree.

## I.

### FACTS

The facts in the underlying action are not in dispute. In 1992, Marlyn Potts entered into a physician-patient relationship with Dr. Robert Cross and Thoracic & Cardiovascular Surgery, Inc. (TCSI). Mrs. Potts, a nurse, reported a lump in her left breast and a thickening of her right breast. She signed a consent form and asked Dr. Cross to biopsy both breasts. Dr. Cross chose to biopsy only the left breast; the lump was not malignant. However, the lump in Mrs. Potts' right breast grew larger. She sought treatment from Dr. Linda Linger who immediately referred her back to Dr. Cross to apprise him of the situation. A tissue report revealed a carcinoma of the right breast which necessi-

tated a mastectomy. By this time, the cancer had spread into Mrs. Potts' lymph nodes.

The Pottses, Marlyn Potts along with her husband, Alan Potts, and their children, Kristen Potts, Erin Potts, and Stacey Potts, filed a complaint against Dr. Cross and TCSI alleging medical negligence and loss of companionship and comfort. The Pottses later amended their complaint by contending that Dr. Cross was liable to Marlyn Potts for intentional interference with her employment relationship, intentional interference with her doctor-patient relationships, and outrage.[1]

During the relevant time period, Dr. Cross and TCSI were insured by Insurance Corporation of American (ICA). The ICA policy became effective on July 7, 1993 and carried a retroactive date of January 1, 1987. The policy provided $1,000,000 coverage per claim with an annual aggregate of $3,000,000 subject to the following limitation:

### IV. LIMITS OF LIABILITY

The "Per Claim" amount stated in the Schedule of Declarations, or any applicable endorsement wherein the Limits of Liability have been amended, in effect at the time a claim is first made is the maximum amount we will pay for all claims resulting from one incident. Our total liability during any one policy period will not exceed the "Annual Aggregate" amount.

Regardless of the imposition of interest, including prejudgment interest, on any final adjudication against you, our total liability for injury will not exceed the "Per Claim" amount filed for any one incident and, subject to the same per claim limit filed for each incident, our total liability during any one policy period will not exceed the stated annual aggregate.

For the purpose of determining our "per claim" limit of liability, "per claim" means the total amount of all claims filed by all claimants for any one incident. The following will be considered one incident:

Cross interfered with the physician-patient relationships she had developed or was attempting to develop with various doctors.

---

1. Marlyn Potts alleged that she was denied a promotion at work due to the actions of Dr. Cross. She further alleged that she could not obtain the health care she desired because Dr.

a. all injury resulting from a series of acts or omissions in providing medical services to one person and

b. all injury arising out of continuous or repeated exposure to substantially the same general condition and

c. all injury to a mother and her unborn child or children arising out of acts or omissions in providing medical services.

The trial in this case was scheduled to begin on April 1, 1997. Two weeks prior to this date, ICA was placed in receivership and was enjoined from conducting business. As a result, ICA was precluded from negotiating settlements in pending cases. Neither could WVIGA intervene because the prerequisites necessary to trigger its statutory obligations had not yet occurred.[2] Due to the posture of the case, Dr. Cross and TCSI requested a continuance which was denied by the circuit court. The case proceeded to trial as scheduled. Two days later, before a verdict was returned by the jury, the parties settled the Pottses' claims, placing the terms of the agreement on the record. Dr. Cross and TCSI agreed to pay the Pottses $400,000 before May 1, 1997; the Pottses would receive the first $150,000 collected from WVIGA; and the proceeds from any bad faith claims would be split with 40% going to counsel, 30% going to the Pottses, and 30% going to Dr. Cross and TCSI.

The jury returned a verdict in favor of the Pottses on April 4, 1997. Marlyn Potts was awarded $1,031,137.50 in compensatory damages and $1,000,000 in punitive damages. Alan Potts was awarded damages for mental anguish in the amount of $10,000 and each of the children was awarded damages for mental anguish in the amount of $20,000. The verdict was reflected in the judgment order entered by the circuit court on April 7, 1997.

On April 28, 1997, ICA was declared to be insolvent and was ordered to be liquidated.

This event triggered the statutory obligations of WVIGA. When WVIGA's efforts to settle the claims were unsuccessful, WVIGA brought a declaratory judgment action and paid into the registry of the court the statutory cap of $300,000.[3] WVIGA specifically asked the court to declare that its liability and obligation was limited to a single statutory covered claim and to require the defendants to interplead and settle among themselves their rights to the interpleader fund.

Dr. Cross and TCSI counterclaimed by asserting that they paid the Pottses $400,000 in conformity with the settlement agreement, and they, therefore, held a covered claim in the amount of $300,000. The Pottses counterclaimed asserting that each of them held a separate and distinct covered claim under the Guaranty Act for a total of five covered claims. Dr. Cross and TCSI then moved for partial summary judgment, asking the court to disperse one-half of the interpleader fund to the Pottses and one-half to them.[4] At the same time, WVIGA moved for summary judgment stating that only one covered claim was presented for payment and the statutory cap for that claim had been paid. On November 22, 1999, the interpleader fund was dispersed by agreed order, and Dr. Cross and TCSI were dismissed from the action with prejudice. The counterclaims of the Pottses remained.

The agreed order states that "[t]he parties further agree that they shall not be precluded from presenting any arguments relative to the remaining claims by and between WVIGA and the Potts Defendants[; these claims] are not waived or otherwise affected by the resolution of the motions referenced above." Furthermore, "[t]he issue as to whether the Potts defendants are entitled to additional monies from the plaintiff, WVIGA with respect to their counterclaims shall remain the subject of this declaratory judgment action."

---

2. W.Va.Code § 33–26–5(5) (1985) states:

(5) "Insolvent insurer" means an insurer (a) licensed to transact insurance in this state either at the time the policy was issued or when the insured event occurred and (b) against whom an order of liquidation with a finding of insolvency has been entered by a court of competent juris-

diction in the insurer's state of domicile or of this state.

3. The $100 statutory deductible was inadvertently overlooked.

4. WVIGA took no position as to how the $300,000 should be distributed.

The court took WVIGA's motion for summary judgment under advisement. Upon further consideration, the court entered a final order which states that loss of consortium claims are derivative claims and the ICA policy "does not include loss of consortium as a separate 'incident' for which the per claim limits apply." WVIGA's motion for summary judgment was granted. It is from this order that the Pottses appeal.

## II.

## DISCUSSION

The issue we must resolve is whether the Pottses have presented for payment one claim or five claims under the West Virginia Insurance Guaranty Association Act. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

On appeal, the Pottses allege the circuit court erred by granting summary judgment to WVIGA because the term "covered claim" is defined by statute rather than the ICA policy and the per incident limit in the policy does not change the per claim cap contained in the Guaranty Act into a per incident cap.

WVIGA contends the circuit court properly granted summary judgment because Marlyn Potts' injury and the derivative claims of her husband and children present a single claim, which is subject to one $300,000 statutory cap, under both the policy and the Guaranty Act. The issue presented here is a question of first impression in this Court.

WVIGA was established by statute to protect claimants and policyholders from financial losses associated with the insolvency of an insurance company. W.Va.Code § 33–26–2 (1970) reads as follows:

> The purpose of this article is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.

WVIGA accomplishes its purpose through a guaranty fund. When an insurance insolvency occurs, WVIGA sets up a pool that is initially funded by insurance companies doing business in West Virginia[5] who then recoup these sums from their policyholders.[6]

---

**5.** W.Va.Code § 33–26–8 (1985) states in pertinent part:

(1) The association shall:

(a) Be obligated to the extent of the covered claims existing prior to the determination of insolvency, and for such claims arising within thirty days after the determination of insolvency, but such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars and is less than three hundred thousand dollars. In no event shall the association be obligated to a policyholder or claimant in an amount in excess of the obligations of the insolvent insurer under the policy from which the claim arises.

(b) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, defenses and obligations of the insolvent insurer as if the insurer had not become insolvent.

(c) [A]ssess member insurers separately for each account amounts necessary to pay the obligations of the association under subdivision (a) of this subsection subsequent to an insolvency, the expenses of handling covered claims subsequent to an insolvency, the cost of examinations under section thirteen [§ 33–26–13] of this arti-

cle and other expenses authorized by this article. The assessments of each member insurer shall be in the proportion that the net direct written premiums of the member insurer for the preceding calendar year on the kinds of insurance in the account bears to the net direct written premiums of all member insurers for the preceding calendar year on the kinds of insurance in the account. Each member insurer shall be notified of the assessment not later than thirty days before it is due. No member insurer may be assessed in any one year on any account an amount greater than two percent of that member insurer's net direct written premiums for the preceding calendar year on the kinds of insurance in the account.

**6.** W.Va.Code § 33–26–16 (1970) states:

The rates and premiums charged for insurance policies to which this article applies shall include amounts sufficient to recoup a sum equal to the amounts paid to the association by the member insurer less any amounts returned to the member insurer by the association and such rates shall not be deemed excessive because they contain an amount reasonably calculated to recoup assessments paid by the member insurer.

Claims insured by the insolvent company are paid from the fund.

The liability of WVIGA is statutorily limited to the payment of covered claims. The Guaranty Act defines a "covered claim" as:

an unpaid claim, ... which arises out of and is within the coverage of an insurance policy to which this article applies and which policy is in force at the time of the occurrence giving rise to such unpaid claims if (a) the insurer issuing the policy becomes an insolvent insurer after the effective date of this article [May 12, 1970] and (b) the claimant or insured is a resident of this state at the time of the insured occurrence, or the property from which the claim arises is permanently located in this state. "Covered claim" shall not include (i) any amount in excess of the applicable limits of coverage provided by an insurance policy to which this article applies[.]

W.Va.Code § 33–26–5(4) (1985). In this case we are presented with one injured claimant and four loss of consortium claims. The Pottses contend these claims represent five separate covered claims while the WVIGA contends only one aggregated covered claim exists under the Guaranty Act. The jurisdictions which have decided this question are divided.

Several jurisdictions find the claims are aggregated. *See Vickodil v. Pennsylvania Ins. Guar. Ass'n*, 356 Pa.Super. 325, 514 A.2d 635 (1986) (PIGA was not liable for separate claim by wife for loss of consortium where it had already paid maximum amount on husband's claim for bodily injury, which arose out of the same incident); *Knipp v. Ariz. Prop. & Cas. Ins.*, 156 Ariz. 137, 750 P.2d 895 (1987) (a wrongful death action brought by multiple beneficiaries of an individual killed in an airplane accident constituted only one covered claim under the statute providing for payment of claims of insolvent insurance companies); *Florida Ins. Guar. Ass'n, Inc. v. Cole*, 573 So.2d 868 (Fla.App. 2 Dist.1990) (three survivors who sued under the Wrongful Death Act for the death of one person caused by the act of a single insured were entitled to a single claim against FIGA limited by statutory maximum of $300,000 even though the limitation of liability for any one

occurrence in relevant insurance policy provided for more generous coverage); *Builders Transport v. S.C. Prop. & Cas.*, 307 S.C. 398, 415 S.E.2d 419 (1992) (wrongful death claim was only one covered claim within meaning of the Act and the number of covered claims was not determined by the number of beneficiaries entitled to proceeds from wrongful death claim); *Cox v. Minnesota Ins. Guar. Ass'n*, 508 N.W.2d 536 (Minn.App.1993) (assertion of automobile accident victim's covered claim under the primary policy issued by an insolvent insurer precluded victim's mother from asserting a covered claim against MIGA as the primary policy had a single, per-accident limit and, thus, there was only one covered claim); *Igwilo v. Property Insurance*, 131 Md.App. 629, 750 A.2d 646 (2000) (parents' claims for child's pre-birth injury and for economic and non-economic damages resulting from medical malpractice were a single covered claim for purposes of the PCIGC's liability; also, all claims derived from the independent bodily injury to the child's mother, including husband's claim for loss of consortium, constituted a single covered claim).

Conversely, other jurisdictions find the claims to be separate and distinct. *See Oglesby v. Liberty Mut. Ins. Co.*, 832 P.2d 834 (Okla.1992) (Guaranty Association is obligated to pay individual claims of each beneficiary up to the statutory maximum of $150,000 upon insolvency of insurer in wrongful death action rather than an aggregated total of $150,000 to all victims); *Dickerson v. Thompson*, 89 Ohio App.3d 399, 624 N.E.2d 784 (1993) (decedent's wife and two minor children each had a separate covered claim on which the state insurance guaranty association was obligated to pay; decedent's personal injury action is distinct from the wrongful death action); *Cooper v. Huddy*, 581 So.2d 723 (La.App. 1 Cir.1991) (decedent's five survivors' wrongful death claims constituted five separate claims, rather than only one claim; *superceded by statute*, La. R.S. 22:1382 (1990) to provide a maximum limit of three hundred thousand dollars per accident or occurrence).

This Court previously discussed the term "covered claim" in conjunction with the Guar-

anty Act but in a different context. In *De-Vane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622 (1999), the issues presented were whether the Guaranty Act required exhaustion of the hospital's solvent insurance before Mrs. DeVane could recover from WVIGA and whether the circuit court could enforce a pre-insolvency settlement agreement against WVIGA. We were not asked to determine whether WVIGA could be liable for multiple claims stemming from one injury.

The facts of *DeVane* are similar to the facts in the case *sub judice*. In *DeVane*, Richard Richardson received medical treatment from Dr. Kennedy in the emergency room of Charles Town General Hospital, Inc. As a result of such treatment, Mr. Richardson died. The decedent's personal representative, Cheryl Richardson DeVane who was his widow and sole beneficiary, instituted a civil action alleging medical malpractice by Dr. Kennedy and ostensible agency and vicarious liability of the hospital. Mrs. De-Vane entered into a settlement agreement with ICA, Dr. Kennedy's insurer. Shortly thereafter, ICA was declared to be insolvent. WVIGA assumed responsibility for the claims for benefits filed against ICA by West Virginia residents. WVIGA disputed its liability for ICA's obligations arising from the pre-insolvency settlement agreement and refused to tender the settlement amount. Mrs. DeVane asked the circuit court to enforce the settlement agreement against WVIGA. The court directed that the agreement be entered as a judgment. WVIGA moved to intervene and asked the court to set aside its ruling. The court granted WVIGA's motion to intervene and WVIGA appealed to this Court.

On appeal, this Court affirmed the ruling of the circuit court enforcing the settlement agreement against WVIGA. In so doing, we reasoned that:

> the definition of "covered claim" contemplates a(1) claim that is (2) unpaid; (3) "which arises out of and is within the coverage of an insurance policy," which (a) is "in force at the time of the occurrence giving rise to" the claim and (b) was issued by an insurer which became insolvent after May 12, 1970; and (4)(a) that is asserted by a claimant or insured who "is a resident of [West Virginia] at the time of the insured occurrence" or (b) that arises from property which "is permanently located in [West Virginia]."

*Id.*, 205 W.Va. at 530, 519 S.E.2d at 633 (footnote omitted). At that time, we were not asked to decide if Mrs. DeVane and her deceased husband had two separate covered claims or one aggregated claim under the Guaranty Act. We are asked to decide that issue today.

We agree with the courts which hold that each beneficiary or victim has a separate claim under the states' guaranty acts. We note, as they do, that the statutes refer to covered "claims" rather than to covered "occurrences." In particular, the West Virginia Insurance Guaranty Association Act, W.Va. Code § 33–26–8(1)(a) (1985), specifically states that the West Virginia Insurance Guaranty Association is obligated to pay covered "claims" rather than covered "occurrences." The failure to allow each injured party to recover would largely defeat the remedial purpose of our Guaranty Act, which provides that "[t]his article shall be *liberally construed* to effect [its] purpose[.]" W.Va. Code § 33–26–4 (1970) (emphasis added). "Thus, it is evident that a primary intention of the Legislature in promulgating the Guaranty Act was the scrupulous protection of those having claims against insurers, which have been declared insolvent, by facilitating and expediting the process of recovering monies due and owing on such claims." *De-Vane*, 205 W.Va. at 529, 519 S.E.2d at 632.

We agree with the *Oglesby* court that the use of the word "each" in the guaranty acts denotes "any one of a number, separately considered." We also quote with approval the following language from the *Oglesby* opinion:

> The Legislature's use of the word "each" rather than "all" covered claims indicates that it anticipated the possibility of multiple recoveries. Additionally, § 2007 does not use the word "occurrence." It expressly applies the $150,000 limit to "claims". There is no basis for substituting the word "occurrence" for "claim" in order to aggregate multiple claims arising from a single accident.

The plain meaning of the text ... does not support aggregation of multiple claims. *Oglesby*, 832 P.2d at 840 (footnotes omitted). The language in our Guaranty Act is equally clear. If our Legislature had intended the statutory cap to apply to "occurrences" rather than to "claims," they could simply have used the word "occurrences" instead of the word "claims" in the statute. " ' "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syllabus point 6, *State ex rel. ACF Industries, Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999)." Syllabus Point 1, *DeVane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622 (1999).

We, therefore, hold that "[p]ursuant to the West Virginia Guaranty Association Act, specifically, *W.Va.Code*, 33–26–8(1)(a) [1985], the West Virginia Guaranty Association is 'obligated to the extent of covered claims existing prior to the determination of insolvency, and for such claims arising within thirty days after the determination of insolvency....' " Syllabus Point 5, in part, *Cannelton Indus. v. Aetna Cas. & Sur. Co.*, 194 W.Va. 203, 460 S.E.2d 18 (1994). We further hold that loss

of consortium claims presented for payment under the West Virginia Insurance Guaranty Association Act, W.Va.Code §§ 33–26–1 to 19, by a medical malpractice victim's spouse and children are separate and distinct covered claims. Each compensable claim is subject to the statutory per claim limit of $300,000 up to the maximum liability of the insurance policy issued by the insolvent insurer. Each of the five Potts claimants holds a covered claim for which he or she is entitled to payment from WVIGA.[7]

## III.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is reversed and this case is remanded with directions to enter an order consistent with this opinion.

Reversed and Remanded with directions.

---

7. If the Legislature disagrees with this interpretation, they can amend the statute, as Louisiana did, in order to clarify the meaning of "covered claim." Prior to 1990, Louisiana's Guaranty Act was substantially similar to ours. In 1990, Louisiana's Legislature amended their Act to include "only that amount of each covered claim, except return premiums, which is in excess of one hundred dollars and is less than one hundred fifty thousand dollars, per claim, subject to a maximum limit of three hundred thousand dollars per accident or occurrence." La.R.S. 22:1382(A)(1)(a)(iii). *See Rivard v. Petroleum Transport Co.*, 663 So.2d 755, 761 (1995) (citation omitted) ("LIGA contends, essentially, that the 1990 amendments to La.R.S. 22:1382(A)(1)(a)(iii) creating a statutory cap of $300,000 per accident or occurrence should be applied retroactively to this 1983 accident. However, prospective operation of statutes is a general rule, and, as a general rule, is respected by the courts.").