IN THE MATTER OF THE LIQUIDATION OF AMERICAN MUTUAL
LIABILITY INSURANCE COMPANY & another.[1]

Suffolk. March 5, 2001. - June 1, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Statute,* Retrospective statute. *Due Process of Law,* Retroactive application of
statute. *Insurance,* Insolvency of insurer. *Massachusetts Insurers Insolvency
Fund. Subrogation. Contract,* Reinsurance agreement. *Set-Off.*

Claims under workers' compensation policies had priority over claims under
other types of insurance policies in the distribution of insolvent insurers'
estates where, given the relative weakness of the rights asserted by the
objectors to a plan for liquidation of the insurers, the sufficiency of the
public interest that motivated the Legislature to amend the priority scheme,
and the narrow range of claimants who would be affected, this court
concluded that the priority accorded workers' compensation claims in G. L.
c. 175, § 180F, as amended after the liquidation date of the insurers, ap-
plied retroactively, and that such retroactive application did not violate the
objectors' constitutional guarantees of due process. [281-287]
The priority accorded workers' compensation claims in G. L. c. 175, § 180F,
applied to claims presented by the Massachusetts Insurers Insolvency Fund
(MIIF) and other guaranty funds and associations (guaranty funds) that are
attributable to covered claims under policies of workers' compensation
insurance; consequently, claims presented by MIIF and the guaranty funds
had priority over claims under other types of insurance policies in the
distribution of insolvent insurers' estates. [287-289]
A reinsurer's obligations to an insolvent insurer under their reinsurance trea-
ties could not be offset against the insurer's obligations to an affiliate of
the reinsurer under their reinsurance treaties, where the requisite mutuality
for offset did not exist between the affiliates which, while members of an
insurance group that participated in an inter-company pooling and shared
underwriting arrangement, had separate corporate identities; further, the
insolvent insurer was neither a party to nor aware of the group's pooling
arrangement. [292-294]
Certain case reserves and incurred but not reported reserves established by
insurers reinsured by insolvent insurers could not be used as offsets against
amounts presently due and owing from such insurers as reinsurers of the
insolvent insurers, where the Legislature had not acted to allow contingent
claims generally, or case reserves and incurred but not reported reserves
specifically, and where there was no compelling reason to do so based on
the common law of setoff. [294-300]

[1]American Mutual Insurance Company of Boston.

In the Matter of the Liquidation of American Mutual Liability Insurance Company.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on January 17, 1989.

A motion for approval of a plan of liquidation, filed on May 14, 1999, was heard by *Judith A. Cowin*, J., and questions of law were reported by her.

*Eric A. Smith*, Special Assistant Attorney General (*J. David Leslie*, Special Assistant Attorney General, with him) for Commissioner of Insurance.

*Alan J. Cooke* for California Insurance Guarantee Association & others, amici curiae.

*Daniel G. Jarcho* (*Kelly L. Wilkins* with him) for Liggett Group Inc.

*Rhonda L. Rittenberg* (*Susan E. Grondine* with her) for New England Reinsurance Corporation & another.

CORDY, J. A single justice of this court has reserved and reported four questions of law concerning the amended plan of liquidation of American Mutual Liability Insurance Company (AMLICO) and American Mutual Insurance Company of Boston (AMI) (collectively, American Mutual), which came before the county court on a motion for approval by the Commissioner of Insurance (commissioner), acting as the permanent receiver (receiver) of American Mutual.[2]

1. *The questions.* The questions reserved and reported to this court are as follows:

"a. Do claims under workers' compensation policies have priority over claims under other types of insurance policies in the distribution of the AMLICO and AMI estates?

"b. If the answer to question (a) is yes, do claims presented by the Massachusetts Insurers Insolvency Fund [MIIF] and other guaranty funds and associations attributable to covered claims under policies of workers' compensation insurance have priority over claims under other types of insurance policies in the distribution of the AMLICO and AMI estates?

[2]The single justice sitting in the Supreme Judicial Court for Suffolk County has jurisdiction in these liquidation proceedings pursuant to G. L. c. 175, § 180C. See *Matter of the Liquidation of Am. Mut. Liab. Ins. Co.*, 417 Mass. 724, 725-726 (1994) (*Liquidation of AMLICO*).

"c. Are case reserves and incurred but not reported reserves established by insurers reinsured by AMLICO or AMI properly used as offsets against amounts presently due and owing from such insurers as reinsurers of AMLICO or AMI?

"d. Does the requisite mutuality for offset exist between obligations of AMLICO as reinsurer of First State Insurance Company (First State) and obligations of New England Reinsurance Corporation (NERCO) as reinsurer of AMLICO, where NERCO and First State are members of the First State Insurance Group that participate in an inter-company pooling and shared underwriting arrangement?"

2. *The answers.* For the reasons set forth later in this opinion, we answer these questions as follows. Question (a) concerns whether the priority accorded workers' compensation claims in G. L. c. 175, § 180F, as amended after the March 9, 1989, liquidation date of American Mutual, applies retroactively, effectively ensuring no recovery for the objectors (Liggett Group Inc. and Avondale Mills, Inc.). We conclude that it does. As to question (b), we hold that the same priority applies to claims presented by MIIF and other guaranty funds and associations (guaranty funds) that are attributable to covered claims under policies of workers' compensation insurance.

We answer question (c) in the negative, in the absence of a sufficient basis in the common law to conclude that case reserves and incurred but not reported reserves (IBNR) established by insurers reinsured by American Mutual may be used as offsets[3] against amounts presently due and owing from such insurers as reinsurers of American Mutual. As to question (d), we conclude that the requisite mutuality for offset does not exist between obligations of AMLICO as reinsurer of First State, and obligations of NERCO as reinsurer of AMLICO.

3. *Reported questions (a) and (b).*

*Background.* American Mutual, property and casualty insurers domiciled in Massachusetts, wrote primarily workers' compensation, general liability, and automobile lines of insur-

---

[3]The terms "setoff" and "offset" are used interchangeably throughout this opinion.

ance for both commercial and personal lines policyholders. On March 9, 1989, pursuant to G. L. c. 175, § 180C,[4] a single justice entered an order of liquidation, appointment of permanent receiver and permanent injunction (liquidation order), decreeing that American Mutual was insolvent, and appointing the commissioner as receiver. See *Matter of the Liquidation of Am. Mut. Liab. Ins. Co.*, 417 Mass. 724, 725-726 & n.3 (1994) (*Liquidation of AMLICO*).

Most claims under policies of insurance issued by American Mutual are being handled by MIIF, a guaranty fund established by G. L. c. 175D, § 3, and at least forty-five other guaranty funds established in other jurisdictions.[5] Pursuant to G. L. c. 175D, §§ 1 (2) and 5, MIIF pays any covered claims that are unpaid and that arise out of and are within the coverage of an insurance policy (to which G. L. c. 175D applies) issued by an insurer that subsequently becomes insolvent if (a) the claimant

---

[4]Section 180C reads, in pertinent part: "If the commissioner deems that a domestic company . . . is insolvent and that it should be liquidated, he shall make application to the court for a decree authorizing him to liquidate the company. The court, after notice to all known creditors and stockholders of the company and a full hearing, may order its liquidation and appoint the commissioner as permanent receiver thereof. . . . Upon the entry of a decree ordering liquidation of a company the receiver shall proceed forthwith to liquidate the business thereof. Subject to the approval of the court, he may sell or otherwise dispose of the real and personal property, or any part thereof, and sell or compromise all choses in action, of the company. . . . Within one hundred and twenty days of a final determination of insolvency of a company by the supreme judicial court, the receiver shall make application to the supreme judicial court for approval of a proposal to disburse assets out of such company's marshalled assets from time to time as such assets become available, to the Massachusetts Insurers Insolvency Fund [MIIF], the Massachusetts Life and Health Insurance Guaranty Association [MLHIGA], and to any similar organization in another state, such fund, association or organization hereinafter collectively referred to as Funds. The supreme judicial court may approve or disapprove the proposal in whole or in part." See G. L. c. 175, § 6.

[5]We acknowledge the amicus and reply briefs filed by the following guaranty funds and associations (guaranty funds): California Insurance Guarantee Association, Connecticut Insurance Guaranty Association, District of Columbia Insurance Guaranty Association, Florida Workers' Compensation Insurance Guaranty Association, Georgia Insurers Insolvency Pool, Illinois Insurance Guaranty Fund, Maine Insurance Guaranty Association, MIIF, New Hampshire Insurance Guaranty Association, Rhode Island Insurers' Insolvency Fund, Vermont Property and Casualty Insurance Guaranty Association, and Virginia Property and Casualty Insurance Guaranty Association.

or insured is a resident of the Commonwealth; or (b) the property from which the claim arises is permanently located in the Commonwealth. Guaranty funds in other jurisdictions are required by their respective statutes to pay comparable claims. See, e.g., Cal. Ins. Code § 1063.1(c)(1) (Deering 1992 & Supp. 2001); Conn. Gen. Stat. § 38a-838(6) (2000); D.C. Code Ann. § 35-3901(6) (1997); Fla. Stat. § 631.904(2) (Supp. 2001).

Unless a claim arises out of a workers' compensation policy, MIIF pays only "that amount of each covered claim which . . . is less than" $300,000. G. L. c. 175D, § 5 (1) (*a*). MIIF is required to pay claims arising under workers' compensation policies, without limit. *Id.* Persons recovering from MIIF pursuant to G. L. c. 175D are deemed to have assigned the rights under their policies to MIIF, but retain the right to recover from the receiver any amounts under the coverage of their policies not paid by MIIF. G. L. c. 175D, § 8 (1). Once MIIF has paid a claim, the receiver is required to grant to MIIF "priority equal to that which the claimant would have been entitled in the absence of [G. L. c. 175D]." G. L. c. 175D, § 8 (2). This right to assume the priority of the claimant is granted to guaranty funds in other jurisdictions as well. See, e.g., 215 Ill. Comp. Stat. § 5/545(b) (1999); Me. Rev. Stat. Ann. tit. 24-A, § 4442 (2000); Va. Code Ann. § 38.2-1609(B) (1999).[6]

On March 22, 1989, an order entered in the county court requiring that creditors of American Mutual file proofs of claim with the receiver by March 9, 1990. Because the guaranty funds, including MIIF, are the largest creditors of American Mutual, they are in a position to receive the bulk of the distributions from the American Mutual estates.[7]

The priority of payment for allowed claims is governed by G. L. c. 175, § 180F (Supp. 2001). At the time of the March 9, 1989, liquidation order, the order of priorities read as follows:

---

[6]As described more fully in our discussion of reported question (b), *infra*, in a Massachusetts insurer's insolvency proceeding, all of the affected guaranty funds are afforded similar priority. See G. L. c. 175, § 180F (2) (Supp. 2000).

[7]As of March 31, 1999, the funds had paid approximately $635 million on account of the American Mutual estates, of which nearly $530 million was attributable to workers' compensation claims. The funds had recovered approximately $316 million from the estates as of that date. As of December 31, 1998, the funds reported approximately 11,700 pending claims.

"The priorities of distribution in a liquidation proceeding shall be in the following order:

"(1) Expenses of administration;

"(2) Compensation of employees other than officers for services rendered within three months prior to the commencement of a proceeding under [G. L. c. 175, § 180C,] not to exceed [$1,000] for each such employee;

"(3) Claims for taxes and debts due to federal or any state or local government which are secured by liens perfected prior to the commencement of delinquency proceedings;

"(4) Claims by policyholders, beneficiaries, and insurers arising from and within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company, and claims presented by [MIIF], the Massachusetts Life and Health Insurance Guaranty Association [MLHIGA], or any similar organization in another state;

"(5) All other claims."

G. L. c. 175, § 180F, as amended through St. 1985, c. 745, § 20.

Section 46A of G. L. c. 175 provides a priority for workers' compensation claims in Massachusetts insolvency proceedings. At the time the liquidation order was issued, § 46A read:

"When any domestic company which has insured the payment of the compensation provided for by [G. L. c. 152] becomes insolvent . . . unpaid losses under its workmen's compensation policies shall, in the distribution of its assets, whether liquidation is effected by a receiver or otherwise, be deemed and treated as preferred over all claims except debts due the United States and debts or taxes due the commonwealth or any city or town thereof."

There was at that time no statutory provision that explicitly

reconciled the priority scheme in § 180F with that provided in § 46A.[8]

On July 12, 1989, approximately four months after the liquidation order of American Mutual was issued, the Legislature amended the priority clauses of § 180F to make explicit reference to § 46A as follows:

> "(4) Claims by policyholders, beneficiaries, and insureds arising from and within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company, and claims presented by [MIIF], [MLHIGA], or any similar organization in another state; *provided, however, that the workers' compensation claims afforded a preference in [§ 46A] shall be treated as preferred only as respects all other claims in this clause*" (emphasis added).

G. L. c. 175, § 180F, as amended through St. 1989, c. 237, § 12. This statutory amendment became effective by emergency declaration on July 14, 1989. In the emergency letter the Governor declared: "[I]t is in the public interest that this Act [St. 1989, c. 237,] take effect immediately in order to materially assist in confirming the priorities to be ascribed to the claims of creditors in pending proceedings involving insolvent insurers." Section 46A was not amended at this time, however, leaving an inconsistency between the nearly absolute priority set in § 46A and the more limited priority set by § 180F.

On May 14, 1999, the receiver filed a motion with the county court for approval of a liquidation plan. Section IV of the plan outlined five general classes of distribution priority, intended by the receiver to reflect the five successive classes specified in G. L. c. 175, § 180F, as amended through St. 1989, c. 237, § 12. The plan provided three successive subclasses within the fourth (policyholder) priority class, with the first two subclasses

---

[8]Section 46A was initially inserted by St. 1922, c. 407, long before a priority scheme was added to G. L. c. 175, § 180F, by St. 1978, c. 271, § 2. When first added, the priority scheme in § 180F made no reference to § 46A, nor was § 46A amended at that time to make a reference to the priority scheme in § 180F. The receiver urges us to resolve the ambiguity this created, but we need not do so, because the Legislature's amendment of both statutes in 2000 has already settled the issue. See discussion of reported question (a), *infra*.

framed in light of the workers' compensation priority of G. L. c. 175, § 46A (1988 ed.):

> "*Class 4a*: Claims by insureds, insurance guaranty funds, and persons with a cause of action against an insured for losses within the coverage of and not in excess of the applicable limits of workers' compensation insurance policies;

> "*Class 4b*: Claims by insureds, insurance guaranty funds, and persons with a cause of action against an insured for losses within the coverage of and not in excess of the applicable limits of insurance policies other than workers' compensation insurance policies."

Numerous objections were filed to the plan. On November 22, 1999, the receiver filed an amended plan of liquidation, which resolved the concerns of some, but not all, objecting parties. The class 4a and 4b priorities remained unchanged. On April 28, 2000, however, G. L. c. 175, § 180F, was amended once again by the Legislature, St. 2000, c. 78, § 6, and assumed its current form. The paragraph regarding priorities of distribution was struck and replaced by the following paragraph:

> "The priority of distribution from the general assets of an insurer in a liquidation proceeding shall be in the order set forth below. Every claim in each priority class shall, subject to such limitations as may be prescribed by law and that do not directly conflict with the express provisions of this section, be paid in full or adequate funds shall be retained for such payment before the members of the next class receive any payment. . . . The order of distribution of claims shall be:

> "(1) expenses of administration;

> "(2) claims of policyholders, beneficiaries and insureds arising from and within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company and claims presented by [MIIF], [MLHIGA] or any similar organization in another state, but the workers' compensation claims afforded a preference in section 46A shall be treated as preferred only as respects all other claims in this clause . . . ."

G. L. c. 175, 180F (Supp. 2000). The Legislature also amended G. L. c. 175, § 46A, to begin with the proviso: "Except as otherwise provided in section 180F . . . ." G. L. c. 175, § 46A, as amended through St. 2000, c. 78, § 2. Thus, the priority granted in § 46A to unpaid losses under workers' compensation policies was explicitly reconciled with the priority scheme outlined in § 180F. These amendments established in clear language that claims for expenses of the administration of the insolvent estates would have first priority, even over workers' compensation based claims, and the latter claims would have priority over all other claims.[9] In addition, on June 2, 2000, the Legislature expressly made the amendments to §§ 180F and 46A applicable to pending proceedings: "Sections 2 and 6 of this act shall apply to all pending and future claims in liquidation proceedings pending on the effective date of this act and to claims in liquidation proceedings filed after the effective date of this act." St. 2000, c. 78, § 8, as amended by St. 2000, c. 96, § 5.[10]

In light of the April 28 and June 2, 2000, amendments applicable to G. L. c. 175, §§ 46A and 180F, on August 2, 2000 the receiver amended and filed her proposed assignment of priorities. There are eight priority classes listed, but we need only consider the first three:

"*Class 1*: Permanent Receiver's Expenses of Administration;

"*Class 2a*: Claims by insureds, insurance guaranty funds, and persons with a cause of action against an insured for

---

[9]The receiver in her brief notes that St. 2000, c. 78, § 6, also brings § 180F into accord with *United States Dep't of the Treasury* v. *Fabe*, 508 U.S. 491 (1993), where the Court held that State statutes governing insolvent insurer liquidations could grant priority, over claims of the United States, to the insurance claims of policyholders and to the costs and expenses of administering the liquidation, but that States could not give priority to other categories of claims above those pressed by the United States. *Id.* at 493-494. More than one-half of the States have amended their insurance liquidation laws to comply with the *Fabe* decision. Semaya, Insurer Insolvencies in the 21st Century: Will History Repeat Itself? (P.L.I. Commercial Law & Practice Course Handbook No. A0-004P2000).

[10]Statute 2000, c. 96, § 5, corrected an apparent oversight by amending St. 2000, c. 78, § 8, to add a reference to St. 2000, c. 78, § 2, to make it clear that both § 46A, as amended, and § 180F, as amended, were intended to apply to all pending and future claims in liquidation proceedings.

losses within the coverage of and not in excess of the applicable limits of workers' compensation insurance policies;

"*Class 2b*: Claims by insureds, insurance guaranty funds, and persons with a cause of action against an insured for losses within the coverage of and not in excess of the applicable limits of insurance policies other than workers' compensation insurance policies."

The receiver has concluded that "the [American Mutual] estates are not likely to have sufficient funds to make any distributions to claimants below Class [2]a." Avondale Mills, Inc. (Avondale), and Liggett Group Inc. (Liggett), whose claims are in class 2b, and are thus too low in priority to receive any distributions from this liquidation, objected to the proposed priority of class 2a.

*Question (a).* With specific reference to question (a), both Avondale and Liggett (collectively, objectors) concede that because of the most recent amendments, the priorities now provided in G. L. c. 175, §§ 46A and 180F (Supp. 2000), expressly apply to this pending proceeding. We need not attempt to reconcile inconsistencies or ambiguities in earlier versions of §§ 46A and 180F, as the receiver invites us to do, for the Legislature spoke plainly in the 2000 amendments, and where, as here, "the language of a statute is clear and unambiguous, it is conclusive as to legislative intent." *Pyle* v. *School Comm. of S. Hadley*, 423 Mass. 283, 285 (1996), citing *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 690 (1991). See *General Elec. Co.* v. *Department of Envt'l Protection*, 429 Mass. 798, 802 (1999); *Leibovich* v. *Antonellis*, 410 Mass. 568, 576 (1991) ("There is no question of statutory construction in this case, as the Legislature's intentions with regard to retroactivity [to a case pending when the statute was passed] are expressly stated"). Nevertheless, the objectors contend that these proceedings are governed by the version of the statute in effect at the time of the liquidation order in March, 1989, and that application of the workers' compensation preference scheme as provided in the 2000 amendments "offends due process in altering retroactively . . .

substantial property interest[s] without meaningful justification."[11]

The law concerning the retroactive application of statutes in this Commonwealth is well settled. "The rule that guides judges in deciding whether a retroactive statute violates due process rights under the Fourteenth Amendment to the United States Constitution and arts. 1, 10, and 12 of the Massachusetts Declaration of Rights is that only statutes 'which, on a balancing of opposing considerations, are deemed to be unreasonable, are held to be unconstitutional.' " *Opinion of the Justices*, 423 Mass. 1244, 1248 (1996), quoting *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 189-190 (1978) (*American Mfrs.*).

This evaluation of reasonableness includes three considerations: "the nature of the public interest which motivated the Legislature to enact the retroactive statute; the nature of the rights affected retroactively; and the extent or scope of the statutory effect or impact." *Leibovich* v. *Antonellis, supra* at 577. *Pielech* v. *Massasoit Greyhound, Inc.*, 47 Mass. App. Ct. 322, 328 (1999). In any evaluation of reasonableness, the objectors face a heavy burden, for we give credit to every rational presumption in favor of the legislation. *Carleton* v. *Framingham*, 418 Mass. 623, 631 (1994); *American Mfrs., supra* at 190. See *St. Germaine* v. *Pendergast*, 416 Mass. 698, 702 (1993) ("Where it appears that the Legislature intended an act to be retroactive, this intent should be given effect in so far as the Massachusetts and Federal Constitutions permit" [citation omitted]).

We look first at the nature of the claimed rights affected. The objectors interpret G. L. c. 175, § 180C, to provide that the receivership proceedings should be governed by the version of

---

[11]Avondale bases its claim "in the due process clauses of the federal and Massachusetts constitutions [that] restrain legislative authority to impair rights retroactively," as does Liggett, but Liggett also alludes to a contracts clause claim. The test of reasonableness we apply, *infra*, "is determinative of all arguments of the [objectors], since we perceive no need for separate analysis of their various contentions under the impairment-of-contracts clause and under the due process clause of the United States Constitution and cognate State constitutional provisions." *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 190 (1978).

the priority statutes in effect as of the March 9, 1989, liquidation order:

> "The rights and liabilities of the company and of its credi-
> tors, except those holding contingent claims, and of its
> policyholders, stockholders or members, and of all other
> persons interested in its assets, *shall, unless otherwise
> ordered by the court, be fixed as of the date of the decree
> ordering liquidation*" (emphasis added).

G. L. c. 175, § 180C.[12] Avondale concludes: "At a minimum,
this provision gives policyholders and other claimholders a
substantial interest in the assets of the insolvent insurer as of
[the] date of the liquidation order. There is no evading the clear
language." We have noted, however, that because the insurance
industry is intensely regulated, the element of reliance essential
to a challenge against retroactive application of a statute is
lacking. *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397
Mass. 416, 424 (1986). See *Opinion of the Justices*, 401 Mass.
1211, 1223 (1987) (because savings bank life insurance system
has from beginning been subject to "pervasive regulation,"
participating banks are on notice that future legislation may
alter their position).

The objectors do not argue that they would have acted differ-
ently if they had known that the 2000 amendments would be
enacted. Policyholders purchase insurance with the expectation
of receiving full coverage from a solvent insurer. The objectors
provide no evidence that they, or any other policyholder,
purchased insurance in reliance on what the insurer liquidation
statutes provided in the way of liquidation priorities. Even if
they had done so, the objectors can establish no *contractual*
right to recover any particular distribution in a liquidated estate
when such rights are set by statute. Merely entering into
contracts for insurance does not in itself implicate the priority
scheme established by the Legislature; it is the subsequent
insolvency of the insurer that triggers the statute. See *Rhode
Island Insurers' Insolvency Fund* v. *Leviton Mfg. Co.*, 716 A.2d
730, 735 (R.I. 1998), cert. denied, 525 U.S. 1068 (1999) (enter-

---

[12]This quoted portion of G. L. c. 175, § 180C, has not changed since the
time of the liquidation order.

ing into contract for insurance not enough to trigger recoupment provision of Rhode Island insurance act; insolvency of insurer required).

The objectors contend that the "rights and liabilities" fixed as of the date of the liquidation order include not only their underlying contract rights and liabilities, but the entire liquidation and distributions systems as then set forth in the statute. However, as Liggett's brief acknowledges, "priority schemes applicable to insolvency proceedings frequently are characterized as establishing remedies instead of substantive rights." Liggett attempts to distinguish the present case by asserting that application of the workers' compensation preference as provided in the 2000 amendments would "not merely modify remedies — it would effectively terminate policyholders' underlying rights by placing their claims in a category for which no recovery is possible." However, any contractual right to recover on these claims was impaired by the insolvency of American Mutual, and not by the application of the 2000 amendments to pending proceedings. The priority accorded to the right has been affected, but not the underlying right itself. See Matter of the Rehabilitation of Mut. Benefit Life Ins. Co., No. C-91-00109 (N.J. Super. Ct. Ch. Div. Aug. 12, 1993) (Priority provisions of State insolvency statute are remedial and procedural; creditors "never had a specified right to a priority formula which could not be altered legislatively. The prioritization scheme does not take away the remedies afforded by the underlying contracts, it only affects the order of payment").

In asserting that § 180C fixes their priority rights as of the liquidation date, the objectors overlook the qualifying phrase, "unless otherwise ordered by the court" set forth in that same section. This is language that "implie[s] a power of retroactive adjustment," *American Mfrs., supra* at 194, and should have put the objectors on notice that future changes in the priority scheme were possible.

The presence of such language in the statute is hardly surprising in this context. This court long ago held, in evaluating the effect of the application of an insolvency statute to a contract claim: "The obligation of payment is to be enforced according to the law, as the law may direct from time to time, and the creditor makes and holds his contracts, subject to such alteration

touching the remedy, as the legislature may prescribe." *Bigelow v. Pritchard*, 21 Pick. 169, 175 (1839). We have also noted with approval the exercise of such remedial power by Congress: "There can be no doubt that Congress has the power to regulate and change [bankruptcy] priority rights . . . without violation of the fifth constitutional amendment where the changes are consonant with a fair reasonable and equitable distribution of the assets of a bankrupt estate" (citation omitted). *Boston v. Keene Corp.*, 406 Mass. 301, 310 n.11 (1989), quoting *In re Jay & Dee Store Co.*, 37 F. Supp. 989, 991 (E.D. Pa. 1941).

In *Maryland Ins. Guar. Ass'n* v. *Muhl*, 66 Md. App. 359 (1986) (*Muhl*), the Court of Special Appeals of Maryland faced a challenge to the retroactive application of a priority provision similar to G. L. c. 175, § 180F,[13] based on a statute, Md. Ann. Code art. 48A, § 156, similar to the portion of G. L. c. 175, § 180C, relied on by the objectors. The Maryland court found that apposite Federal and State bankruptcy cases, including *Bigelow* v. *Pritchard*, *supra*, establish clearly that "insolvency laws are remedial in nature, and that, while creditors may develop expectations of what they might receive under those laws, they do not acquire vested rights to particular modes of distribution that are beyond the power of [the Legislature] to alter." *Muhl, supra* at 372. The court concluded: "The caveat in [Md. Ann. Code art. 48A, § 156] is consistent with that notion. If it can be 'otherwise directed by the court,' the rights of the creditors cannot be regarded as so irretrievably fixed as to be beyond alteration." *Id.* at 372-373. We agree that this analysis is a sound one.

We turn next to consider the public interest that motivated the Legislature to enact the amendment. In the 2000 amendments, as noted above, the Legislature made explicit the relationship between the priority provisions of G. L. c. 175, §§ 46A and 180F (Supp. 2000), and reconciled the apparent inconsistency with respect to these two provisions that had existed since the priority scheme was first added to § 180F in

[13]The Maryland court specifically cites G. L. c. 175, § 180F, as "[s]imilar legislation." *Maryland Ins. Guar. Ass'n* v. *Muhl*, 66 Md. App. 359, 367 (1986). Maryland and Massachusetts have both adopted versions of the Uniform Insurers Liquidation Act. 13 U.L.A. 321 (Master ed. 1986 & Supp. 2000).

1978. See note 8, *supra*.[14] We have remarked before in considering the public interest served by an amendment that clarifies rights and obligations in an area of the law previously marked by uncertainty that such an amendment serves a "worthy legislative goal." *Carleton* v. *Framingham*, 418 Mass. 623, 633 (1994). See *Leibovich* v. *Antonellis*, 410 Mass. 568, 577-578 (1991) ("by applying the statute retroactively, the Legislature may have intended to correct what had been an inconsistency in the law").

Avondale argues that the public interest is not served by the retroactive allocation of the workers' compensation priority, because the priority arbitrarily distorts the distribution of assets in favor of those guaranty funds that happen to hold a relatively high percentage of workers' compensation claims. This priority cannot be justified by the fact there is no cap on payment by a fund to an insured under a workers' compensation policy, because even without the priority, all guaranty funds would share ratably in distributions, and those funds with higher percentages of uncapped workers' compensation claims would *still* presumably receive a proportionally higher distribution. This argument, however compelling, is, in the end, simply a disagreement with the priority scheme chosen by the Legislature. As the receiver argues, having chosen to protect uniquely workers' compensation claimants by the priority and unlimited guaranty fund coverage, the Legislature could reasonably conclude that the guaranty funds should share in this priority, in order to "preserve the limited resources of the fund[s]." *Rhode Island Insurers' Insolvency Fund* v. *Leviton Mfg. Co.*, 716 A.2d 730, 734 (R.I. 1998). Avondale may have other ideas about how this end should be accomplished, but "[t]he validity of [the statute] . . . is not pinned to the [objectors'] view of what the statute should seek to accomplish. . . . The choice of purpose

---

[14]It is apparent that the 1989 amendment to § 180F, St. 1989, c. 237, § 12, reflected the same legislative intent by inserting in § 180F an explicit reference to § 46A. Some inconsistency remained because the 1989 amendment did not amend § 46A itself to make it conform with the entirety of § 180F. We note, however, that the remaining inconsistency did not affect the priority of workers' compensation claims over the claims of other types of policyholders.

and means is for the Legislature to make." *Rushworth* v. *Registrar of Motor Vehicles*, 413 Mass. 265, 270 (1992).[15]

Last, we examine the extent or scope of the statutory effect or impact. Avondale concedes that the number of policyholders adversely affected by the 2000 amendments is very small.[16] Avondale nevertheless seeks relief on the basis of this factor, asserting that the risk of less than full payment should be spread more broadly so that the consequences to those adversely affected by the insolvency will be less severe. On closer inspection, this is simply a restatement of the arguments offered in regard to the other two elements of this analysis. The practical effect of *any* insolvency statute may be that certain claims are not paid. This is a result of the insufficiency of the insurer's assets, however, and does not result from a statutory interference with due process rights.

Given the relative weakness of the rights asserted by the objectors, the sufficiency of the public interest that motivated the Legislature to enact the 2000 amendments, and the narrow range of claimants who will be affected by the statutes as amended, we conclude that retrospective application of G. L. c. 175, §§ 46A and 180F (Supp. 2000), is reasonable and does not violate the objectors' constitutional guarantees of due process. We answer reported question (a) in the affirmative.

*Question (b)*. Because the answer to reported question (a) is "Yes," we address reported question (b), which asks if claims presented by MIIF and other guaranty funds attributable to claims under policies of workers' compensation insurance have priority over claims under other types of insurance policies in the distribution of the American Mutual estates.

Avondale concedes that, pursuant to the guaranty fund statutes in Massachusetts and other States, a guaranty fund inherits the priority of the insured on payment of a covered claim to the

---

[15]"Once it is determined that [a statute] furthers legitimate legislative objectives . . . it is for the Legislature to decide how the general problem ought to be addressed, and its action need not resolve or deal with every conceivable problem that may result from the solution it fashions" (citation omitted). *Rushworth* v. *Registrar of Motor Vehicles*, 413 Mass. 265, 271 n.6 (1992).

[16]Among policyholders, only Avondale and Liggett have pursued objections to this stage of the proceedings.

insured. "The receiver, liquidator or statutory successor of an insolvent insurer shall be bound by settlements of claims by [MIIF] and shall grant, against the assets of the insolvent insurer, priority equal to that which the claimant would have been entitled in the absence of this chapter." G. L. c. 175D, § 8 (2). See discussion of G. L. c. 175D, *supra* at 275-276. See also notes 5 and 7, *supra*, and accompanying text. Avondale contends, however, that the Massachusetts guaranty fund legislation applies by its terms only to the Massachusetts insolvency fund, and that the guaranty funds from other jurisdictions are not granted a similar right in a Massachusetts insolvency proceeding. This argument is simply incorrect. General Laws c. 175, § 180F (2), explicitly gives priority not only to MIIF, but to "any similar organization in another state."

We have previously discussed the right of the funds to inherit the rights of policyholders with respect to claims paid by the funds, also known as "subrogation." *Liquidation of AMLICO*, 417 Mass. 724, 730 (1994). In *Liquidation of AMLICO*, we stated that G. L. c. 175D, §§ 5 (1) (*b*) and 8 (1), as applied to MIIF, and the similar statutory provisions in other jurisdictions that apply to the out-of-State funds, "are principally designed to subrogate the funds to any rights the policyholders of American Mutual may have had with respect to claims paid by the funds under the policies." *Id.* at 730-731. We did not distinguish between the subrogation rights of MIIF and those of the out-of-State funds, as Avondale would have us do now. *Id.* To do so would, based on the record before us, render the priority granted to such "similar" funds in § 180F (2) a nullity.

Finally, Liggett asserts that by its terms, § 46A applies only to claims for "unpaid losses" under workers' compensation policies, and because the in-State and out-of-State guaranty funds have already paid more than $500 million to cover losses by workers, those claims are no longer "unpaid" within the meaning of § 46A. Thus, this argument goes, such claims have lost their priority. We reject this reasoning as both circular and inconsistent with the relevant statutes. We agree with the receiver that "unpaid losses" in § 46A refers to *losses unpaid*

*by the insurer.*[17] This interpretation not only appeals to common sense, it is also in accord with the evident intent of the Legislature, as expressed in both G. L. c. 175, § 180F (2), and G. L. c. 175D, § 8 (2), that guaranty funds share in the priority provided to policyholders and claimants, whatever that priority might be.

The objectors provide no arguments that disturb our previous understanding of the subrogation rights of the guaranty funds.[18] We therefore answer reported question (b) in the affirmative.

4. *Reported questions (c) and (d).* Questions (c) and (d) concern what may or may not be offset by a reinsurer against the amount that it owes to the insolvent insurer. The proposed setoff of obligations between mutual debtor-creditors (AMLICO and one or more of its reinsurers) that has prompted questions (c) and (d) is a process that, to the extent it proceeds, proceeds outside of the statutory scheme for the liquidation of insolvent insurers. That is because the offset amount is deducted from what is owed to the insolvent's estate and would not be subject to the priority distribution scheme discussed in relation to reported questions (a) and (b), above. We proceed to first set out the background necessary to a consideration of reported questions (c) and (d), and then, for the reasons given below, answer them in reverse order.

*Background.* Insurance companies are required to establish "loss reserves" so that their financial statements will provide for liabilities arising from insurance policies they have written. Loss reserves include "case reserves" and IBNRs. Case reserves

---

[17]This interpretation accords with the meaning given "unpaid claim" in G. L. c. 175D, § 1 (2) (pursuant to G. L. c. 175D, § 5 [1] [*a*], MIIF pays "covered claims," which § 1 [2] defines as "unpaid claim[s]"). "When the meaning of a statute is brought into question, a court properly should read other [related] sections and should construe them together . . . ." *LeClair* v. *Norwell,* 430 Mass. 328, 333 (1999), quoting *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n,* 394 Mass. 233, 240 (1985).

[18]Avondale also contends that the Massachusetts priority scheme is "not consistent with the aims of [national] uniform [insurance] legislation." We need not address this argument, noting only that the uniform acts, as such, are not binding on any State; they are adopted voluntarily, and often with substantial modifications. See, e.g., 13 U.L.A. 321, 325 (Master ed. 1986) ("The Massachusetts act is a substantial adoption of the major provisions of the Uniform [Insurers Liquidation] Act, *but contains numerous variations, omissions and additional matter . . .*" [emphasis added]).

represent claims that have been reported to the insurer. They consist of estimates[19] of amounts that might have to be paid for pending claims that are being adjusted (that is, where liability itself has not yet been determined, the amount of the liability has not yet been determined, or both).

IBNR are estimates of both the number of claims that have been incurred but have not been reported, and the amounts that might have to be paid on account of those claims. There are a variety of quantitative techniques employed by actuaries to estimate IBNR.

First State Insurance Company (First State) is a corporation organized and existing under the laws of Connecticut, and is wholly owned by Heritage Holdings, Inc. New England Reinsurance Company (NERCO) and New England Insurance Company (New England) are also Connecticut corporations. Each is a wholly owned subsidiary of First State. First State, NERCO, and New England are members of the First State Insurance Group (or Group).

NERCO and AMLICO are parties to a number of treaties of reinsurance[20] under which AMLICO agreed to cede a portion of the risk on insurance policies written by AMLICO, and NERCO agreed to reinsure (or assume) that risk in exchange for a portion of the premium on those insurance policies, all subject to the terms and conditions of the reinsurance treaties (NERCO Assumed Reinsurance Treaties). AMLICO, through the receiver, has submitted claims to NERCO for monies currently due and owing to it under the NERCO Assumed Reinsurance Treaties.

Similarly, AMLICO and NERCO are parties to a number of reinsurance treaties under which NERCO agreed to cede a portion of the risk on insurance policies written by NERCO, and

---

[19]There is some dispute among the parties over the use of the term "estimate" as applied to case reserves and IBNR, but because the meaning of the term is not dispositive in our analysis of the reported questions, and because it is used in this context in the affidavits submitted by both parties, we employ it here.

[20]"When companies buy reinsurance, they deduct the extra protection from their liabilities, effectively raising reserves or lowering potential liability . . . . By spreading companies' risk, reinsurance allows more policies to be written, making insurance more widely available at lower cost." (Citation omitted.) *Quackenbush* v. *Mission Ins. Co.*, 46 Cal. App. 4th 458, 462 (1996).

AMLICO agreed to reinsure (or assume) that risk in exchange for a portion of the premium on those insurance policies, all subject to the terms and conditions of the reinsurance treaties (AMLICO Assumed Reinsurance Treaties). NERCO, through the receiver, has submitted claims to AMLICO under the AM-LICO Assumed Reinsurance Treaties.

Finally, AMLICO and the members of the First State Insurance Group are also parties to a number of reinsurance treaties under which the members agreed to cede a portion of the risk on insurance policies or reinsurance contracts written by the members, and AMLICO agreed to reinsure (or assume) that risk in exchange for a portion of the premium on those insurance policies or reinsurance contracts, all subject to the terms and conditions of the reinsurance treaties (AMLICO Group Reinsurance Treaties). Members of First State Insurance Group, including NERCO and First State, have submitted claims through the receiver to AMLICO under the AMLICO Group Reinsurance Treaties. NERCO and First State have filed a proof of claim in the receivership action that includes claims not only for monies currently due under the treaties, but also for monies likely to be due in the future under the treaties, based on outstanding case reserves and IBNR liabilities.[21]

The treaties described above reinsure against, among other things, latent liability claims including, but not limited to, asbestos and environmental claims. Such latent liability claims are commonly called "long tail claims" in the insurance industry, meaning that a claim by the original policyholder to the insurer, for which the insurer would then seek reimbursement from its reinsurer, could occur many years after the triggering event and the expiration of the insurance policy. The treaties also reinsure against property and general liability claims.

First State, NERCO, and New England have been parties to various reciprocal reinsurance and pooling arrangements among

---

[21] It is important to emphasize here, in light of reported question (d), that AMLICO is not a party to any reinsurance treaty under which it agreed to cede any risk on insurance policies written by AMLICO to members of First State Insurance Group other than NERCO, i.e., AMLICO does not have claims against any member of the Group other than NERCO.

themselves since 1965. Since December 31, 1992, First State, NERCO, and New England have been parties to and thus members of a reinsurance and pooling agreement under which NERCO and New England cede all of their underwriting liabilities to First State, and First State then retrocedes percentages of those liabilities and its own underwriting liabilities to NERCO and New England. Pursuant to this agreement, First State, NERCO, and New England cede premiums, losses, and underwriting expenses in amounts determined by their respective shares of the business. The operations, liabilities, expenses, income, and losses, as related to underwriting, are thereby shared. As a result, all reinsurance placed by or on behalf of any member is considered by the First State Insurance Group to be reinsurance of First State. Because First State's interest in reported question (c) is dependent on our answer to reported question (d), we address the latter question first.[22]

'· *Question (d).* The question, simply put, is whether NERCO's obligations to AMLICO under their reinsurance treaties can be offset against AMLICO's obligations to First State under their reinsurance treaties.

"The general principle has long been established that a setoff is appropriate between mutual debtor-creditors, even if one of them is insolvent at the time the right to the setoff is asserted." *Commissioner of Ins.* v. *Munich Am. Reinsurance Co.*, 429 Mass. 140, 142 (1999) (*Munich American*), citing *Greene* v. *Hatch*, 12 Mass. 195, 198 (1815). However, "[t]he obligations must be mutual, that is, 'the same part[ies] in both claims.' " *Munich American, supra,* quoting *Friedman* v. *Commissioner of Banks*, 291 Mass. 108, 112 (1935). In St. 1998, c. 258, § 1, the Legislature amended G. L. c. 175, § 180C, adding an eighth paragraph that states, in pertinent part: "No set off shall be allowed in favor of any insurer where: . . . (3) the obligation of the insolvent insurer is owed to an affiliate of such insurer, or any other entity or association other than the insurer." While St. 1998, c. 258, § 2, gives this amendment prospective effect only,

---

[22]In their brief NERCO and First State assert: "Because NERCO and First State maintain that mutuality also exists with respect to First State as a member of the First State Insurance Group, First State is included in the discussion of [q]uestion c."

our understanding of the mutuality requirement in preexisting common-law setoff accords with "the public policy expressed in the new statute." *Munich American, supra* at 144.[23]

NERCO and First State concede that they do not meet the requirements of strict mutuality, but argue that it would be "inequitable to apply the rule of strict mutuality in light of the inter-company pooling and shared underwriting arrangements of the Group." In substance, despite their separate corporate identities, they contend that their agreements within the Group make them all the same party for purposes of calculating setoff. We are unpersuaded. "Corporations may not 'assume the benefits of the corporate form and then disavow that form when it is to their and the stockholders' advantage.' " *Spaneas* v. *Travelers Indem. Co.*, 423 Mass. 352, 354 (1996), quoting *Berger* v. *H.P. Hood, Inc.*, 416 Mass. 652, 658 (1993). First State and NERCO acknowledge that AMLICO was neither a party to nor aware of the Group's pooling arrangement, a concession that is also fatal to their equity argument. The cases they cite in support of their argument are all distinguishable on this point. See Stephens *vs.* Federal Ins. Co., No. 93 Civ. 4222 (JSM) (S.D.N.Y. 1995), aff'd sub nom. *Rich* v. *Federal Ins. Co.*, 113 F.3d 1230 (2d Cir. 1997) (setoff allowed because involvement of one party in pool treaties unambiguous); *Marcum* v. *Wilhoit*, 290 Ky. 532, 538 (1942) (setoff allowed because bank officials knew loan sought by party was for benefit of company and not individual use); *Black & Decker Mfg. Co.* v. *Union Trust Co.*, 53 Ohio App. 356, 358-360 (1936) (definite understanding or agreement between the parties that parent company and its two subsidiaries were to be regarded as one organization).

---

[23]Other States share our view of the mutuality requirement. See, e.g., *Quackenbush* v. *Imperial Cas. & Indem. Co.*, 41 Cal. App. 4th 828, 835-837 (1995) (Imperial's obligations to subsidiaries cannot be offset against obligations to Imperial); *Prudential Reinsurance Co.* v. *Superior Court*, 3 Cal. 4th 1118, 1137 (1992) (limits application of set-off doctrine to "true contractual debtor-creditor relationships between principal insurers"; "an unwarranted expansion of the setoff doctrine would permit an exponential increase in the amount subsidiaries could set off to the detriment of liquidation estates"); *Matter of the Liquidation of Midland Ins. Co.*, 79 N.Y.2d 253, 259 (1992), quoting *Beecher* v. *Vogt Mfg. Co.*, 227 N.Y. 468, 473 (1920) ("Under our decisions, debts and credits are mutual when they are 'due to and from the same person in the same capacity' ").

We have no reason to doubt that NERCO and First State derive substantial benefit from their pooling arrangement, but we see no reason to depart from our long-standing requirement of mutuality, and thus we answer reported question (d) in the negative.

*Question (c).* We turn last to reported question (c), which asks us to determine if case reserves and IBNR established by AMLICO's reinsurers may be used as offsets to current liabilities owed by these reinsurers to AMLICO.[24]

In our *Munich American* decision, we recognized a common-law right of setoff in Massachusetts. Specifically, we concluded that a creditor of an insolvent insurer "may apply amounts that it *owes* to the insolvent insurer as an offset against amounts that the insolvent insurer *owes* to it" (emphasis added). *Munich American, supra* at 143. The receiver argues that, because case reserves and IBNR are only estimates of AMLICO's potential future obligations to its reinsurers, they are not "owed" in the sense we intended in the *Munich American* case, and therefore cannot be used to offset current liabilities owed to AMLICO by those same reinsurers.

In the *Munich American* case the specific question of offsetting case reserves and IBNR was not before us. The certified questions in that case only required us to address the offset issue in general terms. *Id.* at 141. We held: "There is nothing explicit or implicit in the statutory scheme for the liquidation of insolvent insurers (G. L. c. 175, §§ 180A-180L) that makes common-law principles of setoff inapplicable." *Id.* at 143. We went on to state: "Authority that we have cited in our discussion of common-law setoff addresses statutorily regulated liquidations of banks and insurance companies without any suggestion that rules of setoff would be different in a receivership or liquidation." *Id.* We further noted: "*In every other State*, the rule is that a reinsurer does not receive an improper preference by having the benefit of setting off amounts an insolvent insurer owes the reinsurer against the reinsurer's debt to the insolvent" (emphasis added). *Id.* at 144. Finally, as noted in our discussion of reported question (d), *supra*, even after demonstrating that the right to set off was firmly grounded in Massachusetts com-

---

[24]We discuss reported question (c) as it applies to NERCO only, in light of our disposition of reported question (d).

434 Mass. 272 (2001)                                            295

In the Matter of the Liquidation of American Mutual Liability Insurance Company.

mon law, we nevertheless made a point of emphasizing that our conclusions were in accord with a recent change in an insurance statute, G. L. c. 175, § 180C, as amended through St. 1998, c. 258, § 1, which would recognize the right to set off prospectively, St. 1998, c. 258, § 2: "The pattern of our cases concerning equitable setoffs, when one party is insolvent and common-law principles apply, *is consistent with the public policy expressed in the new statute*" (emphasis added). *Id.*

While we recognized the right of setoff in the *Munich American* case based on extensive common-law precedent and statutory provisions consistent with that precedent, both here and in other jurisdictions, the specific right to offset case reserves and IBNR is not established, either in the Commonwealth or elsewhere. It also runs counter to the policies embodied in the statutory scheme regarding claims against insolvent insurers, which requires that claims be "absolute" and does not allow payment of any "contingent claim[s]." G. L. c. 175, § 180H.[25]

NERCO is able to cite only one Massachusetts case in support of its argument, which it bases in equity, that for purposes of setoff, case reserves and IBNR are "absolute" and capable of liquidation. NERCO argues that this court, in *Commissioner of Ins.* v. *Massachusetts Acc. Co.*, 314 Mass. 558 (1943) (*Massachusetts Accident*), "exercised its broad equitable powers to ensure that claims against an insolvent are not precluded by a receiver's invocation of the words 'contingent' or 'unliquidated,' and it should do so here." We do not agree that that decision bears on reported question (c), for as the receiver points out, the case is distinguishable from the present matter on a number of points.

*Massachusetts Accident* concerned holders of noncancellable disability policies, who had not become disabled prior to the date of the liquidation order pertaining to their insolvent insurer.

---

[25]General Laws c. 175, § 180H, which has not been amended since inserted by St. 1939, c. 472, § 3, reads, in pertinent part: "Except as provided in [§ 180G], no contingent claim shall share in a distribution of the assets of an insurer . . . except that such claims shall be considered, if properly presented, and may be allowed to share where (*a*) such claim becomes absolute against the insurer on or before the last day fixed by the court for filing of proofs of claim against the assets of such insurer . . . ."

We held that such policyholders had noncontingent claims for breach of contract due to the insolvency, which had effectively cancelled a policy that was by its terms noncancellable. Claims for that breach of contract (i.e., the breach occasioned by the cancellation) were therefore properly filed in the insolvency proceedings pursuant to G. L. c. 175, § 180C, and were not barred by § 180H. *Id.* at 561-566. Unlike the matter now before us, the case did not involve liability insurance, or setoff, or reinsurance, or evaluation of a specific claimant's claim based on projection of future liabilities. Furthermore, NERCO makes no claim, nor could it, that the calculation methods used in *Massachusetts Accident*, which relied on "standard disabled life and mortality tables" to determine the over-all value of the claims and make a proportional allocation to each policyholder, *id.* at 571-572, are in any way comparable to the estimation issues in case reserves or IBNR. To the contrary, in the record before us, the affidavits for both parties cite to chapter 10 of the National Association of Insurance Companies Accounting Practices and Procedures Manual for Property/Casualty Insurance Companies (1998), to help explain the nature of case reserves and IBNR, and the cited section simply states that there are "[v]arious methods" for determining IBNR, and case reserves "may be determined in many ways." *Id.* at 10-1, 10-2. It is no surprise that the receiver and the affiant actuary for NERCO reach starkly different conclusions based on the same industry manual, precisely because there appears to be no single "standard" method of measurement for IBNR and case reserves.[26]

NERCO's attempts to use Federal tax and bankruptcy cases to support its argument are not persuasive. The tax statutes authorize the use of case reserves and IBNR so that insurance companies will not be forced to overstate their taxable income.

---

[26]Liability based on such estimates is also the subject of an ongoing scholarly debate. See, e.g., Veed, Cutting the Gordian Knot: Long-Tail Claims in Insurance Insolvencies, 34 Tort & Ins. L.J. 167, 174 (1998) ("Unliquidated and undetermined claims should be regarded as absolute and unqualified claims" [footnote omitted]); Meriwether, The Contingent Liability Abyss: Tensions for Insurers and Reinsurers, 22 T. Marshall L. Rev. 1, 14 (1996) ("Payment of claims . . . for unliquidated and/or contingent losses, is contrary to a basic tenet of traditional insurance law, which requires proof of an actual loss in a specific amount before claims are paid").

In the Matter of the Liquidation of American Mutual Liability Insurance Company.

*Hanover Ins. Co.* v. *Commissioner of Internal Revenue*, 598 F.2d 1211, 1213-1214 (1st Cir.), cert. denied, 444 U.S. 915 (1979). As for bankruptcy, the Bankruptcy Code does not apply to insurance companies. 11 U.S.C. § 109 (b)(2), (*d*). See *Stamp* v. *Insurance Co. of N. Am.*, 908 F.2d 1375, 1377 (7th Cir. 1990). Therefore, even if "the Federal Bankruptcy Code treats a 'contingent' claim as a debt capable of setoff," as NERCO states in support of its argument, we do not consider this fact persuasive in the context of an industry that has been expressly excluded from that Code.

We have already explained that the right of setoff in Massachusetts, as applicable to the American Mutual liquidation, is based primarily on our State's common law; it is certainly not modeled after the Federal bankruptcy laws. See *Munich American, supra* at 142-144. See also Schwab, Onset of an Offset Revolution: The Application of Set-Offs in Insurance Insolvencies, 95 Dick. L. Rev. 449, 459-460 (1991) ("Because insurance companies have long been excluded from the operation of federal bankruptcy laws, the application of set-offs in insurance insolvency proceedings developed largely as a matter of state law" [footnote omitted]). The prospective set-off provision in § 180C is a statutory adoption of common law, not a provision that adopts Federal bankruptcy law on the subject of contingent liabilities. NERCO's proposed analogy to Federal bankruptcy law thus fails.

Finally, NERCO would have us follow the lead of the New Jersey Superior Court in *Matter of the Liquidation of Integrity Ins. Co*, 299 N.J. Super. 677 (1996), which addressed the question whether that State's commissioner of insurance, acting in her capacity as liquidator of the estate of an insolvent insurer, "has the legal authority to estimate the value of [IBNR] losses and reported case reserves in order to allow such contingent claims to participate in the final distribution of assets." *Id.* at 679.[27] The court found that this was a question of first impression in New Jersey, but also found in cases that predated its

---

[27]This case is not directly on point for the questions before us, because it does not involve setoff, but rather the determination of claims in a State insurer liquidation proceeding. NERCO implicitly acknowledges the problem and offers the following:

modern insurance statutes "a willingness according to general principles of equity to permit estimation and allowance of contingent claims." *Id.* at 683.[28]

There is no such tradition in Massachusetts law. On the contrary, our cases point to a very different tradition. See, e.g., *Webber* v. *Johnson*, 342 Mass. 455, 458-459 (1961) (no offset if claims "not rendered certain and capable of calculation"); *Friedman* v. *Commissioner of Banks*, 291 Mass. 108, 113 (1935) ("Equity will allow a set-off if the claim of the party asserting it has matured . . .").

Other States have declined to allow recovery on contingent claims in insurer insolvency proceedings. In *Quackenbush* v. *Mission Ins. Co.*, 46 Cal. App. 4th 458 (1996), the California Court of Appeal considered a challenge to an insolvency plan in which the commissioner proposed, and the trial court approved, "an insolvency plan permitting [the commissioner] to estimate future IBNR losses for which Mission's reinsurers would be li-

---

"As NERCO['s] . . . setoff rights are determined prior to and apart from any consideration or computation of the estate's assets for final distribution, [its] claim is not subject to the Massachusetts statutory insolvency priority distribution scheme. Therefore, *a determination that NERCO['s] . . . case reserves and IBNR reserves are 'absolute' and capable of liquidation is limited to the context of determining a reinsurer's setoff rights and would not extend to case reserves and IBNR reserves on a wholesale basis.*" (Footnote omitted, emphasis added.)

We are not persuaded. NERCO urges us to find a common-law right to setoff of IBNR and case reserves, but the only common-law case NERCO brings to our attention that is even remotely on point concerns a State-administered insurer liquidation, and not a common-law set-off process which occurs outside of such a proceeding. Were we to follow New Jersey, we would have no principled basis on which to restrict the scope of our decision in the manner that NERCO suggests.

[28]The case has been criticized as contrary to the applicable New Jersey statute by at least one commentator: "Lacking explicit statutory authority, the [New Jersey] court relied on its 'broad equitable power' to afford the 'broadest possible protection' to the public and the various claimants and beneficiaries of the Integrity estate. The trial court's analysis can be questioned. If the claims in question are, indeed, 'contingent' within the meaning of [the statute], the statute would appear to require that they be made 'absolute against the insurer.' Just how that is supposed to happen when no individual claimant has been identified is hard to conceive." Veed, Cutting the Gordian Knot: Long-Tail Claims in Insurance Insolvencies, 34 Tort & Ins. L.J. 167, 182 (1998).

able, although liability for, and the exact amount of, such losses remained undetermined." *Id.* at 461. Under the applicable California statute, however, "claims founded upon unliquidated or undetermined demands" cannot share in the distribution of an insolvent estate "until such claims have been definitely determined, proved and allowed." *Id.* at 463, quoting Cal. Ins. Code § 1025. The court held that, on its face:

> "Section 1025 expressly forbids claimants with contingent or unliquidated claims from participating in a liquidation plan. . . . While the Commissioner's policy and economic arguments may be persuasive, they cannot trump section 1025's express language. The Commissioner notes that actuarial estimates are used to assess the value of future liabilities, and are relied on in the insurance industry to set reserves and estimate future losses. The point of section 1025, however, is to preclude *present payment* of such contingent and unliquidated claims" (emphasis in original).

*Id.* at 467. The California court advised: "[T]he Commissioner's arguments should more properly be addressed to the Legislature, which is empowered to change section 1025 should it choose to do so." *Id.* at 468.

We find it instructive to note, in this vein, that when the Missouri Court of Appeals upheld the estimation of IBNR claims in a liquidation proceeding, it did so because it found that its Legislature had "specifically endorsed" the estimation of such claims in a statute (Mo. Rev. Stat. § 375.1212). *Angoff* v. *Holland-America Ins. Co. Trust*, 937 S.W.2d 213, 217 (Mo. Ct. App. 1996). Illinois also provides, by statute, for the estimation of contingent claims "that are not made absolute and liquidated by the last day fixed by the court . . . . Any such estimate shall be based upon an actuarial evaluation made with reasonable actuarial certainty . . . and, with respect to ceding insurers' claims, may include an estimate of [IBNR] losses." 215 Ill. Comp. Stat. § 5/209(7) (1999).

As discussed above, our Legislature not long ago amended G. L. c. 175, § 180C, to include an offset provision. If the Legislature believed that estimation of case reserves and IBNR should be allowed in the context of such offsets, we assume this would have been reflected in the statute as amended. Because

the Legislature has not acted to allow contingent claims generally, or case reserves and IBNR specifically, and NERCO can provide us with no compelling reason to do so based on the common law of setoff, we answer reported question (c) in the negative.[29]

To summarize, we answer reported questions (a) and (b) in the affirmative, and reported questions (c) and (d) in the negative. This matter is remanded to the county court for further proceedings consistent with this opinion.

*So ordered.*

---

[29]Our conclusion is further strengthened by the fact that under the proposed liquidation plan, claims by the receiver against NERCO would be limited by the same provisions that limit NERCO's claims against the estate (i.e., NERCO is not being required to pay anything on AMLICO's case reserves or IBNR; it is only required to pay on claims that have become fixed). If AMLICO's reinsurers were allowed to offset case and IBNR reserves against monies currently due and owing from those reinsurers to the AMLICO estate, however, the receiver states that she would then need to reconsider whether she should seek to recover reinsurance based on AMLICO's case and IBNR reserves.